Abraham F. ZIMMERMAN, Plaintiff-Appellant,

v.

John M. LEHMANN, District Director, Immigration and Naturalization Service, Defendant-Appellee.

No. 14399.

United States Court of Appeals Seventh Circuit.

Jan. 7, 1965.

944

Anna R. Lavin and Maurice J. Walsh, Chicago, Ill., for appellant.

Edward V. Hanrahan, U. S. Atty., Chicago, Ill., for appellee, John Peter Lulinski, John Powers Crowley, Asst. U. S. Attys., of counsel.

Before DUFFY, KILEY and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

Plaintiff (sometimes called applicant) was born in Russia September 15, 1902. In September 1913, subsequent to the death of his parents, he and his two sisters came to the United States to join their uncle, Isadore Lande, at Fort Wayne, Indiana. At that time plaintiff was admitted for permanent residence, which status he has since continuously maintained, with the exception of three trips, subsequently discussed, which he made outside the country.

On November 8, 1955, a special inquiry officer of the Immigration and Naturalization Service found that plaintiff was an alien excludable from the United States under the provisions of Title 8 U.S.C.A. § 1182(a) (9), in that he had been convicted of a crime involving moral turpitude, and also under the provisions of Title 8 U.S.C.A. § 1182(a) (20), as an alien who attempted to enter the United States without a visa or other proper

documentation. From the order of exclusion plaintiff appealed to the Board of Immigration Appeals which, on March 8, 1956, affirmed the order.

On March 23, 1956, plaintiff filed the instant action in the District Court, by which he sought relief from the exclusion order. That Court allowed defendant's motion for a summary judgment, from which plaintiff appeals.

The Board of Immigration Appeals in affirming the exclusion order stated:

"The applicant, an alien, is a 58-year old married male, a native and last a citizen of Russia, who has been a resident of the United States since 1913 when he was admitted for permanent residence; he has made several short visits outside the United States. In 1952, he made a visit to Canada and reentered in July 1952 on a claim of United States citizenship. On July 19, 1953, he went to Canada and upon his attempt to return on the following day, was held for a hearing but paroled into the United States to resume his residence with his citizen wife and children. The hearing was held; the applicant was found inadmissible on the grounds set forth above and excluded."

Of the numerous grounds urged for reversal, we think that presently we need be concerned with only two: (1) that plaintiff is a citizen of the United States, and (2) that his brief excursions outside the country's borders in 1952 and 1953 did not subject him to the consequences of "entry" on his return, under Sec. 101 (a) (13), Title 8 U.S.C.A. § 1101(a) (13) of the Immigration and Nationality Act of 1952. If either of these contentions is valid, the order under attack cannot stand.

In our consideration of the record we are mindful of the statutory admonition, " * * * findings of fact, if supported by reasonable, substantial and probative evidence on the record considered as a whole, shall be conclusive." Title 8 U.S. C.A. § 1105a(6).

The special inquiry officer as a basis for his exclusion order found:

"1. That the applicant is an alien, a native and citizen of the USSR;

"2. That he entered the United States at New York, New York on September 29, 1913, at which time he was lawfully admitted for permanent residence;

"3. That on January 20, 1939 he was convicted by the United States District Court for the Northern District of Illinois of the offense of attempting to defeat and evade income taxes in violation of Section 145(b) of Title 26 of United States Code and Section 146(b) of the Revenue Act of 1928;

"4. That he entered the United States in July 1952 as a United States citizen at an unknown port in Maine on the border of Canada after a week's vacation in that country;

"5. That the applicant applied for readmission to the United States for permanent residence at International Falls, Minnesota on July 20, 1953 and he was paroled into the United States pending a determination on his application for admission;

"6. That he does not have a valid immigrant visa, reentry permit, border crossing identification card or other entry document."

Plaintiff's claim to citizenship is based on the premise that shortly after his admission for permanent residence he was legally adopted at Fort Wayne, Indiana, by his uncle, Isadore Lande, although he continued to use the name Zimmerman. In 1923, when plaintiff was twenty years of age, Isadore Lande became a naturalized citizen at Flint, Michigan. During the intervening years, plaintiff resided with his adoptive parent. Thus, plaintiff argues that he as an adopted child acquired citizenship by reason of the naturalization of his adoptive parent.

The government asserts that inasmuch as this question was not raised in

the District Court, it cannot be considered for the first time on appeal. We think to the contrary. The issue is jurisdictional inasmuch as the proceedings were instituted and the order of exclusion obtained on the basis that plaintiff was an alien, not a citizen.

Plaintiff's claim to citizenship is based upon the Act of March 2, 1907, Section 5 (Title 8 U.S.C.A. § 8 *), which provides:

> "A child born without the United States of alien parents shall be deemed a citizen of the United States by virtue of the naturalization of or resumption of American citizenship by the parent, wherein such naturalization or resumption takes place during the minority of such child. The citizenship of such minor child shall begin at the time such minor child begins to reside permanently in the United States."

■ In construing this provision we are not aided by any Federal case or legislative history. Plaintiff's theory is that "a child born without the United States" includes an adopted child, and that "by naturalization * * * by the parent" includes an adoptive parent. Plaintiff argues with some plausibility that Congress in employing the terms "child" and "parent" must have had in mind the general rule announced by numerous State courts that the status between an adoptive parent and an adopted child is identical with that existing between a natural parent and his child. See 2 C.J.S. Adoption of Children § 55 page 446. Even so, we doubt, certainly are not persuaded, that this general principle bears any relevancy to the Congressional purpose underlying the provision in question. Defendant cites two opinions of the Attorney General of the United States which hold that there is no statute which bestows American citizenship on adopted aliens. 38 Op.Atty. Gen. 217; 38 Op.Atty.Gen. 397. It is our view and we so hold that plaintiff did not become a citizen by reason of the premise asserted or otherwise.

In 1931, plaintiff left the United States for a six-week trip to Europe, and returned to this country the following year. It is conceded that this departure and return was legal and constituted no impairment to his status as a permanent resident alien.

The circumstances surrounding plaintiff's 1952 and 1953 visits to Canada form the basis for the order under attack. On July 20, 1953, at International Falls, Minnesota, he was stopped at the Canadian border by an immigration officer and refused admission. On the following morning a hearing was had during which plaintiff claimed that he was a citizen of the United States as the adopted child of his uncle, a naturalized citizen. Plaintiff was permitted to enter on parole, and the hearing was continued and later concluded in Chicago. Concerning the hearing at International Falls, the inspector in his report stated:

> "At his hearing at International Falls on July 21, 1953 the applicant testified that he was born in Proskuroff, Russia on September 15, 1902 and that he was a United States citizen by adoption. He stated that he first entered the United States at New York in September or October 1913. This entry was verified and the record establishes that he was admitted to the United States at New York on September 29, 1913 for permanent residence. The applicant testified that he has lived in the United States since his entry in 1913 except for three temporary absences. He stated that he made a six weeks' trip to Europe, leaving in the latter part of 1931 and returning to New York in January 1932; that in July 1952 he visited Canada for about one week; and that on July 19, 1953 he crossed into Canada for a period of less than twenty-four hours prior to his application for readmission at In-

---

* See 8 U.S.C.A. § 1432.

ternational Falls, Minnesota on July 20, 1953."

We note that in the main the information given by plaintiff at this hearing was later verified, other than his claim that he was entitled to admission as a citizen.

During the hearing at International Falls, plaintiff voluntarily revealed that in July 1952 he and his family visited in Canada and returned after a five- or six-day vacation. As we understand, defendant contends that this entry was illegal and that plaintiff forfeited his status as a resident alien. Relative to plaintiff's 1952 absence from the United States, the inspector in his report stated:

"The applicant testified that he reentered the United States in July 1952 at an unknown port in Maine on the border of Canada; that he was questioned by an immigrant inspector; that he did not have any entry documents or passport; that he told the inspector that he was born in Russia and that he was a United States citizen; that the inspector asked how he acquired citizenship and that he stated he acquired citizenship by adoption; and that he did not recall any further questions."

Defendant in support of its exclusion order places great stress upon United States ex rel. Volpe v. Smith, 289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298, which affirmed a deportation order sustained by this Court. 7 Cir., 62 F.2d 808. In that case the alien who sought reentry falsely stated that he was a naturalized citizen and that his papers were in Chicago. That was a statement of fact which the Court held constituted fraud and deceit, which disarmed the inspector and terminated the inspection. That is a far cry from the situation here where there is no contention that plaintiff made a false, fraudulent or deceptive statement of fact. The opinion expressed by him related to a question of law, the resolution of which, as previously shown, is still in dispute. Plaintiff revealed to the inspector the true facts upon which he relied for his claim to citizenship. Even the officer who conducted the hearing at International Falls and detained plaintiff for further examination was in doubt as to his citizenship status, as is shown by his letter to plaintiff, dated July 20, 1953, "You do not appear to me to be clearly and beyond a doubt entitled to enter the United States."

Since Volpe, the Supreme Court has evidenced an increasing concern toward the rights of aliens sought to be deported. In Fong Haw Tan v. Phelan, 333 U.S. 6, page 10, 68 S.Ct. 374, page 376, 92 L.Ed. 433, the Court in construing a section of the Immigration Act stated:

"We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile, Delgadillo v. Carmichael, 332 U.S. 388 [68 S.Ct. 10, 92 L.Ed. 17]. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used."

Of more direct relevance to the instant situation is the recent decision in Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000, wherein the Court rejected the harsh definition of "entry" as had been previously employed in numerous cases, including Volpe. The Board of Immigration Appeals did not have the benefit of this case, which was decided June 17, 1963, long after the exclusion order. It is not revealed whether the decision in Fleuti, rendered eleven days prior to the judgment appealed from, was called to the District Court's attention.

In Fleuti, an alien who had been admitted to this country for permanent

residence made a two-hour visit to Mexico. His return was held by the Immigration and Naturalization Service to constitute an illegal entry, and he was held to be deportable. Without discussing the case in detail, we think it sufficient to note that the Court in reversing the order of deportation held that the alien did not lose his status as a resident alien because of his trip to Mexico.

The Court was concerned with what constitutes an "entry" within the meaning of Sec. 101(a) (13) of the Immigration and Nationality Act of 1952 (Title 8 U.S.C.A. Sec. 1101(a) (13)), and sets forth (page 452, 83 S.Ct. page 1807) the statutory definition of the term. It was particularly concerned with the "exception" language contained in that definition:

"*  *  * except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place  *  *  * was not intended or reasonably to be expected by him or his presence in a foreign port or place  *  *  *."

The Court reviewed numerous decisions which had applied the harsh rule announced in Volpe, supra, as well as the legislative history of the provision defining the term "entry." It also compared the exceptions found in Sec. 101 (a) (13) with the provision of the immigration laws defining what constitutes "continuous residence" for an alien wishing to be naturalized. The Court stated (page 459, 83 S.Ct. page 1811):

"This enlightened concept of what constitutes a meaningful interruption of the continuous residence which must support a petition for naturalization, reflecting as it does a congressional judgment that an alien's status is not necessarily to be endangered by his absence from the country, strengthens the foundation underlying a belief that the exceptions to § 101(a) (13) should be read to protect resident aliens who are only briefly absent from the country."

The Court stated (page 461, 83 S.Ct. page 1811):

"In making such a casual trip the alien would seldom be aware that he was possibly walking into a trap, for the insignificance of a brief trip to Mexico or Canada bears little rational relation to the punitive consequence of subsequent excludability. There are, of course, valid policy reasons for saying that an alien wishing to retain his classification as a permanent resident of this country imperils his status by interrupting his residence too frequently or for an overly long period of time, but we discern no rational policy supporting application of a re-entry limitation in all cases in which a resident alien crosses an international border for a short visit. Certainly if that trip is innocent, casual, and brief, it is consistent with all the discernible signs of congressional purpose to hold that the 'departure  *  *  * was not intended' within the meaning and ameliorative intent of the exception to § 101(a) (13)."

And further (page 462, 83 S.Ct. page 1812):

"We conclude, then, that it effectuates congressional purpose to construe the intent exception to § 101 (a) (13) as meaning an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence."

■ We think the Court's reasoning is pertinent, in fact controlling, in the instant situation. At the time of his 1952 visit to Canada, plaintiff had continuously maintained his status as a resident alien for some thirty-nine years. He was married to an American citizen, had three minor children who were born in this country, all dependent upon him

for support, and had a residence and business in Chicago. From the fact that he took his family on a harmless, innocent vacation trip to Canada, it would border on the absurd to ascribe to him an intention of impairing his status as a permanent resident of this country.

In Wadman v. Immigration and Naturalization Service, 329 F.2d 812 (9th Cir.), one of the questions considered in a deportation proceeding was whether the alien was entitled to certain discretionary relief which depended upon a continuous residence in this country for a period of seven years. The Service had denied such relief on the ground that the alien's continuity of residence had been interrupted by a ten-day vacation trip, five days of which were spent in Mexico. The Court on the strength of Fleuti reversed the Board of Immigration Appeals on this point and stated (page 816):

> "The problem in Fleuti, upon which the court divided, was whether a voluntary and knowing departure could nevertheless be found to be 'not intended.' Upon this the court, at page 462, construed the intent required as one 'to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence.' The law, it concluded, 'protects the resident alien from unsuspected risks and unintended consequences of such a wholly innocent action.' * * * In our judgment the term 'continuous' is no more subject to a hard and fast construction than is the term 'intended.' The question is whether the interruption, viewed in balance with its consequences, can be said to have been a significant one under the guides laid down in Fleuti."

For the reasons stated, it is our judgment and we so hold that plaintiff in returning to the United States from Canada on the occasion of either the 1952 or 1953 trip did not make an illegal "entry" within the meaning of Sec. 101 (a) (13) of the Immigration and Nationality Act of 1952. It follows that his status as a resident alien was not impaired.

The judgment is reversed and the cause remanded for such further proceedings as may be consistent with this conclusion.