MATTER OF JANATI-ATAIE

In Deportation Proceedings

A–10761136

*Decided by Board January 30, 1972, and April 30, 1972*
*Decided by Attorney General October 26, 1972*

A lawful permanent resident alien who procured the necessary travel documents for himsef and his family and traveled thousands of miles for a visit of a month with his parents in Iran, made a conscious and intended departure in a manner which is meaningfully interruptive of his permanent resident status. Hence, upon return to the United States following his absence of a month to Iran, such alien made an entry within the meaning of section 101(a)(13) of the Immigration and Nationality Act upon which to predicate a ground of deportation.

CHARGE:

Order: Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Convicted of a crime involving moral turpitude committed within 5 years after entry and sentenced to prison for a period of 1 year or more.

| ON BEHALF OF RESPONDENT: | ON BEHALF OF SERVICE: |
|---|---|
| Jack Wasserman, Esquire | Irving A. Appleman |
| Warner Building | Appellate Trial Attorney |
| Washington, D.C. 20004 | Stephen M. Suffin |
| Gordon C. Shelley, Esquire | Trial Attorney |
| 1117 Forest Street | (Brief filed) |
| Reno, Nevada 89502 | |
| (Counsel of record) | |

**BEFORE THE BOARD**
(January 30, 1972)

The case comes forward on appeal by the Immigration and Naturalization Service from the decision of the special inquiry officer that the respondent was not deportable as charged and that the proceedings be terminated.

The respondent is a 33-year-old married male alien, a native and citizen of Iran, whose status in the United States, after his marriage to a United States citizen in 1962, was adjusted to that of

216

a permanent resident under the provisions of section 245 of the Immigration and Nationality Act. The respondent and his wife have one child, who is a United States citizen by reason of birth in the United States.

In 1965 the respondent returned to Iran to visit his parents and he was absent from the United States for a period of 35 days. In 1968 he made a second trip to Iran to introduce his wife and child to his parents. He was absent from the United States this time for a period of 30 days.

On May 8, 1968, the respondent was convicted in the Second Judicial District Court of the State of Nevada in and for the County of Washoe of two offenses of embezzlement in violation of the Nevada Revised Statutes 205.300, which crimes were committed during the period of March 1, 1968 to April 10, 1968. As a result of his conviction he was sentenced to confinement in the Nevada state prison for a period of three years. He served part of his sentence but he is now on parole. The record indicates that he has made restitution of the money embezzled. It is on the basis of this conviction that he is charged with being deportable under section 241(a)(4) of the Immigration and Nationality Act.

Counsel for respondent argued that on the two above stated occasions when the respondent returned to the United States after his visits to Iran he did not make an "entry" into the United States as the term is delineated in *Rosenberg* v. *Fleuti,* 374 U.S. 449 (1963), and therefore the crime for which he was convicted did not occur within five years after his only entry, which was as a student on November 30, 1958. The special inquiry officer upheld this contention and terminated the proceedings. The Service on appeal contends that the respondent made an entry on each of the two occasions when he returned to the United States in 1965 and 1968. This is the sole question for our determination.

Entry is defined in section 101(a)(13) of the Immigration and Nationality Act as follows:

The term "entry" means any coming of an alien into the United States, from a foreign port ... except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary.

The court in *Fleuti* concluded that the "intent" exception contained in the above quoted provision, which became law in 1952, was for the protection of returning resident aliens and should be construed as meaning an intent to depart in a manner which could be regarded as meaningfully interruptive of the alien's permanent

residence. The court stated that such intent can be inferred from the length of time the alien is absent, the purpose of his visit and whether the alien has to procure any travel documents in order to make the trip. The court further stated that no one of these criteria is conclusive and that the operation of these and other possibly relevant factors remains to be developed by the gradual process of judicial inclusion and exclusion.

Before the *Fleuti* decision in 1963 the courts held the view that a resident alien who returns to the United States after a brief excursion or after an absence for any period, however brief, makes a new entry within the meaning of the immigration laws and therefore is subject to all exclusionary provisions of the statute. The courts held that the term "entry" included any coming of an alien from a foreign port into the United States whether such coming be the first or subsequent one and that the word "entry" should be construed in its ordinary meaning, *i.e.*, any coming into the United States, no matter how brief the period the person was absent.[1]

It is clear that the *Fleuti* decision was an attempt by the courts to ameliorate the harshness of these decisions. In the case before us now we are concerned very much with the respondent's intent when he left the United States. Did he intend to effect a meaningful interruption of his permanent resident status by departing in a manner disruptive of this status? After a careful review of the recent court decisions and the Board decisions relative to what constitutes an entry, we hold that the respondent in the instant case did not make an entry on the two occasions when he returned to his permanent residence in the United States.

The doctrine enunciated in *Rosenberg v. Fleuti* has indeed been the subject of development and interpretation in subsequent cases before this Board and before the courts. The principal cases are as follows.

In *Matter of Guimaraes*, 10 I. & N. Dec. 529 (BIA 1964), we held that standing alone, the fact that the alien did not intend to disrupt his permanent residence status was not decisive but that it was one factor to consider. In that case respondent went for a one month visit to relatives in Portugal, and we stated that it was clear that he did intend to depart the United States in a manner which was meaningfully interruptive of his status. And, in *Matter of Caudillo-Villalobos*, 11 I. & N. Dec. 15 (BIA, 1965), aff'd 361 F.2d 329 (C.A. 5, 1966), we held that where a permanent resident alien made numerous short trips to Mexico to appear before a clerk of

---

[1] *Volpe v. Smith*, 289 U.S. 422 (1932); *Chew v. Colding*, 344 U.S. 590 (1952); *Bonetti v. Rogers*, 356 U.S. 691 (1958).

the court to report and sign a bond book (he was convicted of a crime involving moral turpitude in Mexico) it clearly constituted an intended, meaningful departure from the United States. This case was decided principally on the basis of the purpose of his visit, which was not a casual type of thing. This Board has consistently held that where the purpose is to engage in an unlawful activity outside the United States, no matter how brief the visit to the foreign country, this would automatically subject the person to the consequences of having made an entry when he returns.[2] In the instant case the respondent's departure, absence and return were in no way relevant to the underlying ground of deportability. The purpose of his trips, which is to be considered under *Fleuti*, was to visit his parents.

*Fleuti* was followed by *Zimmerman* v. *Lehman*, 339 F.2d 943 (C.A.7, 1965), cert. denied 381 U.S. 925, in which a resident alien who had been in the United States for 30 years made a five or six day vacation trip to Canada. The court considered that the alien's long legal residence in the United States, the fact that he was married to a United States citizen with three United States citizen children, and that he had a home and business in the United States, indicated that he did not intend to disrupt his permanent residence, and thus he did not make an entry when he returned.

The *Zimmerman* case was followed by *Bregman* v. *INS*, 351 F.2d 401 (C.A.9, 1965) (decided ten months after the *Zimmerman* case), in which the alien made visits to England on two occasions, one for approximately seven or ten days and the second visit for seven days. The court remanded the case to the Board to reopen with instructions that further consideration be given to the alien's *intent* at the time of departure, as the absences standing alone did not subject the alien to the consequences of having made an entry upon return. The case was resolved in the alien's favor by the special inquiry officer. In a decision by this Board in November of 1965, following the *Bregman* case, *Matter of Quintanilla-Quintanilla*, 11 I. & N. Dec. 432 (BIA, 1965), the alien visited Mexico for one week where he visited relatives and made a religious pilgrimage. We held that it was clear that he did not intend to interrupt his legal residence of many years in the United States. In that case he entered the United States with his alien registration card, which, the Board pointed out, must be carried by an alien at all times anyway. Finally, in *Matter of Tafoya-Gutierrez*, 13 I. & N. Dec. 342 (BIA, 1969), the alien, after being convicted of a crime in the

---

[2] *Matter of Corral-Fragoso*, 11 I. &. N. Dec. 478 (BIA, 1966); *Matter of Wood*, 12 I. & N. Dec. 170 (BIA, 1967); *Matter of Valencia-Barajas*, Interim Decision No. 2001 (BIA, 1969).

United States and placed on probation, went to Mexico the day following his conviction and stayed there for six months. We considered that this length of time plus the facts that he had no job to return to, and no family or property in the United States, constituted an intended, meaningful interruption of his permanent residence status.

All the cases since *Fleuti*, both before this Board and the courts, cited above and others, indicate quite clearly that no one factor is conclusive as to whether there was a meaningful interruption of the alien's legal permanent residence status, but they further indicate that most careful consideration must be given to the intent factor. The importance of the "intent" element has been emphasized in all recent cases regarding entry.

It is our opinion that the respondent in the instant case did not make an entry when he returned from the two trips to Iran. The length of time he was away was a reasonable minimum time in which to travel to Iran for a visit with his parents. Also, this Board has never held that the distance from the United States of the country to which the alien goes is determinative, considering the swift jet airplane travel available.

It is true that the respondent did have to renew his Iranian passport, but here again no one factor is controlling. His intent not to interrupt or abandon permanent residence is indicated by the following facts: That his trips were of relatively short duration, that he had both real and personal property here, that he had an established home here, that he had a permanent steady job to which he was returning, that his wife and child, both United States citizens, are living with him here, and that the purpose of his trips was to visit his parents.

We will affirm the decision of the special inquiry officer terminating the proceedings and will dismiss the Service appeal.

**ORDER:** It is ordered that the appeal be and the same is hereby dismissed.

**BEFORE THE BOARD**

(April 30, 1972)

The Immigration and Naturalization Service has filed a motion asking that we reconsider and withdraw our order of January 30, 1970; find respondent deportable; and remand to the special inquiry officer for further proceedings.

The facts, about which there is no dispute, have been fully stated in the special inquiry officer's order and in our opinion dismissing the appeal therefrom. It is not necessary, therefore, to repeat them.

220

We have given most careful consideration to the briefs filed, and after such consideration we hold that our decision of January 30, 1970 correctly interprets the facts and the law relating to the matter before us. Accordingly the motion to reopen the proceedings will be denied.

**ORDER:** *It is ordered* that the motion be and the same is hereby denied.

### BEFORE THE ATTORNEY GENERAL ON REVIEW
(October 26, 1972)

The Board of Immigration Appeals, at the request of the Commissioner of Immigration and Naturalization, has referred this case to me for review pursuant to 8 CFR 3.1(h)(1)(iii). The Board has denied a motion of the Immigration and Naturalization Service for reconsideration of the Board's order dismissing an appeal by the Service from the decision of a special inquiry officer holding respondent not deportable.

Respondent is a native and citizen of Iran. He was admitted to the United States in 1958 as a student and subsequently his status was adjusted, in 1962, to that of a permanent resident on the basis of his marriage to a citizen of the United States. The respondent and his wife have one child born in the United States.

He left the United States for a visit to Iran for a period of 35 days in 1965, and again visited Iran for a period of 30 days in 1968. Thereafter in the latter year, he was convicted in a Nevada state court on two counts of embezzlement committed that year, and sentenced to confinement in prison for a term of three years.

The instant proceedings were instituted by the Immigration and Naturalization Service under section 241(a)(4) of the Immigration and Nationality Act ("the Act"), 8 U.S.C. 1251(a)(4), which authorizes the deportability of any alien who

is convicted of a crime involving moral turpitude committed within five years after *entry* and either sentenced to confinement or confined therefor ... for a year or more. (Emphasis added.)

The term "entry" is defined in section 101(a)(13) of the Act, 8 U.S.C. 1101(a)(13), to mean

any coming of an alien into the United States from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, *except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended* or reasonably to be expected by him or his presence in a foreign port or place in an outlying possession was not voluntary.... (Emphasis added.)

The issue in this matter is whether respondent's returns to the

United States following his 1965 and 1968 trips to Iran fell within the portion of the first exception to section 101(a)(13) of the Act that is underlined above. If so, neither of the returns involved an "entry" within the meaning of section 101(a)(13) and respondent is not deportable under section 241(a)(4).

The Board's affirmance of the Special Inquiry Officer's decision that respondent is not subject to deportation is based on its reading of *Rosenberg* v. *Fleuti*, 374 U.S. 449 (1963), the controlling precedent here. That case raised the question whether a resident alien had made an "entry", as defined in section 101(a)(13), and thus could be deported under section 241(a)(1), 8 U.S.C. 1251(a)(1), as being within a certain class of aliens excludable "at the time of such entry." Fleuti, a Swiss national who had resided here almost four years, left the United States, stayed in a Mexican border town for a few hours and returned. The Supreme Court concluded that, under some circumstances, such an "innocent, casual, and brief" trip across a border would fall within the first exception to the definition of "entry" in section 101(a)(13). More particularly, the Court construed what it called this "intent exception" as meaning "an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence". 374 U.S. at 462. Among the factors to be considered in passing on the issue of intent in this context, said the Court, are the length of time the alien is absent, the purpose of the visit outside the United States and whether the alien has to procure any travel documents in order to make his trip "since the need to obtain such items might well cause the alien to consider more fully the implications involved in his leaving the country." *Ibid.**

The lower courts, as well as the Board, have had a number of occasions to consider the reach of *Fleuti*. In *de Bilbao-Bastida* v. *INS*, 409 F.2d 820 (C.A. 9, 1969), *cert. dismissed*, 396 U.S. 802, the Court held there was an entry where the alien returned after a two-month trip which included an illegal visit to Cuba. The Court noted that two months is "considerably longer than the 'couple of hours' that Fleuti was absent." 409 F.2d at 823. Moreover, it also took note of the fact that travel documents were necessary for portions of the trip.

The Board has found that an entry occurred in each of three different years when an alien returned after spending a month's vacation in Mexico visiting his family. *Matter of Abi-Rached*, 10 I. & N. Dec. 551 (1964). The Board distinguished *Fleuti*, stating that

---

* Since, however, attention had not been previously focused upon the application of §101(a)(13) to the case, the Court viewed the record as inadequate for that purpose and remanded the case for further consideration of the issue.

one month "does not fall within the Supreme Court references to the brief absence of one who 'merely stepped across an international border'." (p. 552) Similar reasoning was employed in *Matter of Karl*, 10 I. & N. Dec. 480 (1964), where the alien reentered illegally after a 10-day trip to Mexico, and *Matter of Guimaraes*, 10 I. & N. Dec. 529 (1964), where a month's trip to Portugal on a family visit was involved.

On the other hand, the Seventh Circuit has held that a return from a "harmless, innocent" vacation trip to Canada for five or six days was not an entry within the meaning of the statute. *Zimmerman v. Lehmann*, 339 F.2d 943 (C.A. 7, 1965), *cert. denied*, 381 U.S. 925. Similarly, in *Yanez-Jacquez v. INS*, 440 F.2d 701 (C.A. 5, 1971), the Fifth Circuit has held that a return from Mexico after a trip of less than one day was not an entry even though the trip itself had been for an illegal purpose and was not "innocent."* The Board took a similar position with respect to a one-week trip to Mexico for a family visit and religious pilgrimage. *Matter of Quintanilla-Quintanilla*, 11 I. & N. Dec. 432 (1965).

Apparently the only judicial decision where a trip outside this hemisphere of more than a week's duration was found not to involve an entry is *Itzcovitz v. Selective Service Board*, 447 F.2d 888 (C.A. 2, 1971). The case arose from a long history of dispute between the alien and both the Selective Service System and the Immigration and Naturalization Service. The alien sought a declaratory judgment that a contemplated three-week trip to Israel, to undertake a training course required by his employer, would not involve an entry within the meaning of section 101(a)(13) upon his return to the United States. The Second Circuit found that the alien would come within the *Fleuti* exception. While noting that the duration of the proposed trip—three weeks—would be longer than any previously held not to involve entry, the Court observed that it would still be of short duration. It stressed that the purpose of the trip would be to fulfill an employer's requirement for training and would not reflect merely personal reasons. Further, and perhaps most important, the Court emphasized that the alien was "not in the posture of having taken the trip in disregard of the immigration consequences; rather he * * * sought relief in advance" by bringing the declaratory judgment action. 447 F.2d at 894. Taking these factors into account, without reference to the necessity of obtaining travel documents mentioned in *Fleuti*, the Court found on the particular facts that the trip would come within the intent exception in section 101(a)(13).

---

*See also *Vargas-Banuelos v. INS*, 466 F.2d 137 (C.A. 5, 1972); but see *Solis-Davila v. INS*, 456 F.2d 424 (C.A. 5, 1972).

In arriving at the decision now before me, the Board applied a number of the relevant factors that were pointed out in *Fleuti* and the later precedents. It characterized the duration of the trips as "relatively short" and "a reasonable minimum time in which to travel to Iran for a visit with his parents." It emphasized that the alien owns property, has a home, a permanent job, and a wife and child who are United State' citizens. It explained that the purpose of the trips was to visit family and while it noted that travel documents were necessary for the trip, it attached little significance to these circumstances. Assessing all these factors, it decided that there was no entry because the alien did not intend to "interrupt or abandon" his permanent resident status.

I cannot agree with the Board. First, the important factor of time weighs heavily against the respondent. In *Fleuti*, the duration of the absence from the United States was a few hours spent on the other side of an easily-crossed border. In every "no-entry" case since, except *Itzcovitz*, it was a period of time substantially shorter than the 30 and 35 days involved in respondent's trips. In finding no intent to "meaningfully interrupt" in *Itzcovitz*, however, the court emphasized that the alien was before it to obtain prior judicial construction of the entry provision as applied to him, thus affirmatively demonstrating that he had no intention to disrupt or interrupt his residence here. There is no such affirmative action on respondent's part.

The second factor mentioned in *Fleuti* is the purpose of the trip. Except for *Itzcovitz*, the cases since *Fleuti* have laid little emphasis on this factor. In *Itzcovitz*, however, the court found it significant that the three-week trip was an employer's training requirement, not a personal choice of the alien. Here only the element of choice was present.

Finally, the *Fleuti* court, noting the ease with which travel across the Canadian and Mexican borders can be accomplished, pointed to the necessity of travel documents as a factor in judging whether there has been an intent to depart in a manner which can be regarded as a meaningful interruption of permanent residence. Having to obtain such documents, the Court reasoned, demonstrates a much more conscious intent to depart the United States than a relatively simple trip over a contiguous border. Here respondent took steps to renew his Iranian passport prior to one trip and his wife had to obtain a United States passport and an Iranian visa. These actions involve far more than a casual "stepping across an international border."

It is not disputed that the respondent had a home, a job and property in this country or that he had no intention of abandoning his permanent resident status. The issue, however, is whether he

had an intent to depart within the meaning of the statute as interpreted by *Fleuti*. It seems to me that an alien who, on more than one occasion, procures the necessary travel documents for himself and his family and travels thousands of miles for a stay of a month or more has made a conscious and intended departure in a manner which is meaningfully interruptive of the alien's permanent residence in the United States.

Realizing that any order of deportation may have serious consequences for the alien involved, I am nevertheless obliged to conclude that the reentry of this respondent into the United States after his trips to Iran was an "entry" within the meaning of section 101(a)(13). Any other result would leave little basis for principled decision as to when a resident alien has entered the country within the meaning of that provision and when he has not.

For the foregoing reasons, the order of the Board is vacated and the case is remanded to the Board for further proceedings consistent herewith.