**Miguel Angel LEAL–RODRIGUEZ,**
**Petitioner,**

v.

**IMMIGRATION AND**
**NATURALIZATION SERVICE,**
**Respondent.**

**No. 91–3692.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 23, 1992.

Decided April 6, 1993.

As Amended April 19, 1993.

---

**940**

Robert E. Lehrer, Legal Assistance Foundation of Chicago, Susan Compernolle (argued), Legal Assistance Foundation, Douglas Schoppert, Coursey & Schoppert, Chicago, IL, for petitioner.

Fred Foreman, U.S. Atty., Office of the U.S. Atty., Criminal Div., Chicago, IL, Mark C. Walters, Lori L. Scialabba, Joseph F. Ciolino (argued), Dept. of Justice, Office of Immigration Litigation, Richard L. Thornburg, U.S. Atty. Gen., Office of the U.S. Atty. Gen., Washington, DC, A.D. Moyer, Michael L. Harper, Samuel Der-Yeghiayan, I.N.S., Chicago, IL, for respondent.

Before CUMMINGS, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Miguel Leal–Rodriguez ("Leal") brings this appeal from an order of deportation affirmed by the Board of Immigration Appeals (BIA). An immigration judge ordered Leal deported on two grounds: as an alien convicted of a controlled substance violation, *see* 8 U.S.C. § 1251(a)(11) (1988), and as an alien who entered into the United States without submitting to inspection, *see* 8 U.S.C. § 1251(a)(2) (1988).[1] Under the current immigration regime, aliens found deportable for violations of the inspection requirements do not receive equitable hearings to decide whether deportation should be suspended. Accordingly, Leal brings a two-pronged attack on this judgment. First, he contends that his return to the United States did not constitute an "entry" within the meaning of section 101 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 (1988) *et seq.*, as construed by *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), so that he cannot be expelled for "entering" this country without inspection. In the alternative, he argues that he should be eligible for equitable relief from deportation under INA § 212(c) even though he was found deportable for entry without inspection. The issues raised by this case are complex and unusually difficult to decide because the original statutory texts, now overlaid with four decades of judicial rulings, administrative interpretations, and congressional amendments, have become "an untidy patchwork, even, one might say, a mess." *Campos v. INS*, 961 F.2d 309, 315 (1st Cir.1992). Nevertheless, we hold that Leal did make an entry subjecting him to deportation for failure to present himself for inspection, and that he is not entitled to an equitable hearing under section 212(c) of the INA.

---

1. The Immigration Act of 1990, Pub.L. 101–649, 104 Stat. 4978 (1990), renumbered and in some instances revised the grounds upon which an alien may be deported. Drug convictions are now listed as grounds for deportation at § 1251(a)(2)(B)(ii), and entries without inspection at § 1251(a)(1)(B). The 1990 Act provided that these changes would not apply in deporta-tion proceedings for which notice was given to an alien before the act went into effect. Since Leal was provided notice on June 20, 1983, we refer to the section numbering in the original statute. Throughout this opinion, unless otherwise indicated, we refer to the edition of the United States Code applicable to Leal at the time of the BIA's decision.

## I.

We begin with a reprise of the events that ultimately led to Leal's order of deportation. We accept the BIA's factual findings as supported by reasonable, substantial, and probative evidence. *See* 8 U.S.C. § 1105a(a)(4) (1988); *Woodby v. INS*, 385 U.S. 276, 281–83, 87 S.Ct. 483, 485–87, 17 L.Ed.2d 362 (1966); *Zalega v. INS*, 916 F.2d 1257, 1259 (7th Cir.1990).

Leal was born in Mexico in 1949. He entered the United States in 1970 and married Irma Montenegro, an American citizen, one year later. After the birth of the couple's first daughter in 1974, Leal became a lawful permanent resident alien of the United States. Except for the one trip discussed below, Leal has lived continuously in this country since his first arrival in 1970.

In 1980, Leal was convicted in the Northern District of Illinois of possession with intent to distribute heroin. He was sentenced to six months work-release as part of a five-year period of probation. While on probation, Leal planned a short trip to Mexico to visit his ailing grandfather and to sell a piece of land that he owned there. Before leaving, he consulted his probation officer and obtained written permission to travel.[2] Leal crossed into Mexico by car on December 21, 1982; he attempted to return through the Immigration and Naturalization Service's (INS) inspection point at Eagle Pass, Texas, on January 6, 1983.

At Eagle Pass, Leal presented himself for inspection, seeking readmission as a returning resident alien. While they were checking his baggage, immigration officers found the letter from Leal's probation officer, which alerted them to his 1980 drug conviction. After verifying this information, the officers determined that Leal should not be admitted into the United States. They then took several actions. The officers accepted a sworn and signed statement by Leal describing the nature and circumstances of his drug violation. *See* CR 200. They also served him with a Form I–122, an immigration document that advised Leal that he was not presently entitled to enter the United States because of his drug conviction, but that he would be notified by mail (to be sent to an address in Mexico that Leal provided) of the time and place of his exclusion hearing before an immigration judge. *See* CR 170. Finally, the officers confiscated his "green" or alien registration card.

Before the immigration judge and the BIA, Leal complained that the officials at Eagle Pass did not inform him that he was entitled to receive a formal exclusion hearing. Both courts found this testimony incredible. *See* CR 3, 37–41. The immigration judge noted that Leal claimed he did not remember receiving any documentation at Eagle Pass, even though only one week later he handed his attorney in Chicago the Form I–122, which stated his right to present his case before an immigration judge. *See* CR 38. The judge found more believable the rebuttal testimony of Inspector Charles E. Cunningham, the supervisory immigration inspector who signed the Form I–122. According to Cunningham, INS follows a standard procedure in all cases involving denials of entry. An immigration officer advises the alien of the charge of excludability against him and of his right to appear before an immigration judge. The officer also provides him with a list of legal aid attorneys, including their addresses and phone numbers. *See* CR 105–06, 122. Finally, a returning resident alien is told to return during hours when a supervisor is present who can determine whether he may be permitted to enter under the *Fleuti* doctrine. *See* CR 106, 112. Cunningham confirmed that all aliens are told their rights in Spanish—in fact, he testified that he and the two other inspectors who witnessed Leal's written statement speak Spanish. *See* CR 121–22. Leal's individual

---

**2.** This letter was not included in the administrative record of Leal's deportation hearing. Accordingly, its precise contents are unknown. The only description in the record of how Leal obtained permission, that given by Francis J. Maloney, Leal's probation officer, sheds little light on the issue: "[W]hen [Leal] requested permission to go to his native Mexico ... we approached the court to obtain the necessary permission for the visit. Permission was granted, and Mr. Leal went to Mexico." Certified Administrative Record (CR) at 209.

file, Cunningham stated, indicated that all proper steps had been taken in his case. *See* CR 105–06.

Leal, however, neither waited for his exclusion hearing to be scheduled, nor returned to see an immigration supervisor, nor called any lawyer on the legal aid list. Instead, he took a bus that same day from Eagle Pass to the port of entry near Laredo, Texas, and crossed the border by wading through the Rio Grande. He then walked for some twenty hours until being picked up by a traveler and taken to Chicago. According to later testimony, Leal felt he needed to return quickly because his oldest daughter was hospitalized. Upon his return to Chicago, Leal contacted his attorney, Consuela Bedoya, who moved to terminate the exclusion proceedings in Texas since her client had already entered the country.

Leal testified that he had been told the wait for his exclusion hearing could last indefinitely—that it "could take a day, could take a week, could take a month, could take a year or two years."[3] CR 69. In fact, INS sent a letter to Leal's address in Mexico on March 17, 1983, scheduling his exclusion hearing for April 19, 1983. After receiving Bedoya's letter, INS administratively closed its exclusion case. On June 15, 1983, INS charged Leal with deportability under 8 U.S.C. § 1251(a)(2) and (11) based on his entry without inspection and his drug conviction. On March 18, 1986, the immigration judge found Leal deportable and denied his consideration for a section 212(c) waiver. On October 25, 1991, the BIA dismissed his appeal.[4]

## II.

■ The first issue before us involves the BIA's ruling that Leal is properly de-

portable for entering the United States without inspection. Leal contends that the BIA's interpretation of the INA does not deserve deference because it violates Supreme Court precedent.

### A.

Immigration law features two parallel statutory schemes for regulating the movements of non-citizens. One involves exclusion, or the process of excluding people who seek to enter the United States, while the other involves deportation, or the process of expelling people who are already present in the country. Section 212 of the INA sets forth thirty-three grounds upon which an alien may be excluded. *See* 8 U.S.C. § 1182(a) (1988). Section 244 lists twenty grounds supporting deportation. *See id.* § 1251(a). The grounds for exclusion largely overlap with those for deportation, although they are not identical. Some grounds for exclusion have no counterpart among the deportation grounds. *See, e.g., id.* § 1182(a)(4), (6), (11) (exclusion based on sexual deviance, contagious disease, or polygamy). Likewise, there are two grounds for deportation that have no analog within the exclusion provisions. *See id.* § 1251(a)(2), (14) (deportation based on possession of illegal firearms or entry without inspection). Failure to submit to inspection upon entry into the United States is the main issue in this case.[5]

One of the more venerable principles of immigration law is the "entry" or "reentry" doctrine," under which an alien is subject to possible exclusion every time he seeks to be readmitted to this country after a trip abroad. Even if the alien's inadmissibility is not detected at the time of admission, he can still be placed in deportation proceed-

---

3. The immigration judge observed the inconsistency between this testimony and Leal's claim, *see* p. 941 *supra,* that the officers did not tell him of his right to have an exclusion hearing scheduled at all. *See* CR 38.

4. Leal has remained in the United States during the pendency of this appeal subject to a stay of deportation. *See* Respondent's Status Report at 1.

5. Section 241 of the Act provides:

> Any alien in the United States (including an alien crewman) shall, upon order of the Attorney General, be deported who— ... entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this chapter or in violation of any other law of the United States.

8 U.S.C. § 1251(a)(2) (1988).

ings anytime thereafter under a catch-all section of the deportation provisions. *See* 8 U.S.C. § 1251(a)(1) (1988). It was the harshness of the reentry doctrine that led the Supreme Court, in *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), to rule that certain kinds of departures would not lead to "entries" at all.

*Fleuti* involved a four-year permanent resident alien, George Fleuti, who crossed the border into Mexico and then returned after a visit of several hours. At the time of his return, Fleuti was excludable as an alien "afflicted with psychopathic personality" because he was a homosexual, *see* 8 U.S.C. § 1182(a)(4) (1988), although he was not in fact excluded from admission into the United States. The INS sought to deport Fleuti under the catch-all provision of the deportation statute, according to which he "was within one or more of the classes of aliens excludable by the law existing at the time of such entry." *Id.* § 1251(a)(1). Significantly, Fleuti could not have been deported had he never left the country in the first place, since the INA did not list affliction with psychopathic personality as a ground for deportation.

The Supreme Court expressed concern about the fairness of expelling a lawful resident who unwittingly jeopardized his right to live in this country by going abroad for a matter of hours. The Court explained:

> Certainly when an alien like Fleuti who has entered the country lawfully and has acquired a residence here steps across a border and, in effect, steps right back, subjecting him to exclusion for a condition, for which he could not have been deported had he remained in the country seems to be placing him at the mercy of the "sport of chance" and the "meaning-

less and irrational hazards" to which Judge Hand alluded. *Di Pasquale* [*v. Karnuth*, 158 F.2d 878, 879 (2d Cir. 1947)]. In making such a casual trip the alien would seldom be aware that he was possibly walking into a trap, for the insignificance of a brief trip to Mexico or Canada bears little rational relation to the punitive consequence of subsequent excludability.

*Fleuti*, 374 U.S. at 460–61, 83 S.Ct. at 1811. In order to remedy this inequitable result, the Court fashioned an exception to the strict reentry doctrine.

Construing the definitional section of the INA,[6] the Court reasoned that an alien makes an "entry" only when he "inten[ds] to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." *Id.* at 462, 83 S.Ct. at 1812. In a phrase, it held that returns to this country will not count as "entries" if they follow foreign excursions that are "innocent, casual, and brief." *Id.* Some factors proposed by the Court for determining whether a departure yields a true entry are the duration of the alien's absence, the purpose of his visit, and whether he procured travel documents that would have alerted him to the possible consequences of leaving the country. As the Court explained, subjecting a returning alien to the exclusion process only if he has knowingly undertaken a meaningful trip "protects the resident alien from unsuspected risks and unintended consequences of such a wholly innocent action." *Id.*

**B.**

In Leal's case, the BIA found that Leal's departure qualified as "meaningfully interruptive" of his residence under two of

6. Section 101 of the INA defines "entry" as follows:

> The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney Gen-

eral that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided*, That no person whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception.

8 U.S.C. § 1101(a)(13) (1988).

*Fleuti*'s three factors. First, it held that Leal's need to secure permission to travel from his probation officer put him on notice that he might encounter difficulties due to his narcotics conviction upon his return to the United States. *Matter of Leal*, No. A35 049 314 at 3 (BIA Oct. 25, 1991). Second, it ruled that Leal's trip lost its innocent purpose when he decided, at the last minute, to cross into the United States through the Rio Grande. That decision, according to the Board, sullied the entire visit to Mexico. *Id.*

The BIA also relied on the reasoning of its own decision in *Matter of Kolk*, 11 I. & N. Dec. 103 (BIA 1965), to hold as a general matter that Fleuti does not apply to permanent resident aliens who enter without inspection. In *Matter of Kolk*, the BIA stated that the policy of inspecting aliens dated back to the Act of March 3, 1875, 18 Stat. 477 (1875), and has been a continuous feature of the immigration system ever since. It cited the section of the INA that provides: "All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe." 8 U.S.C. § 1225(a) (1988). Those regulations specifically require an alien to apply in person at a place designated as a port of entry and place on him the burden of establishing his admissibility. *See* 8 C.F.R. 235.1. The BIA concluded there: "If the immigration laws and the established techniques of inspection are to have any meaningful and rational application it must be held that the respondent made an entry from a foreign port or country ... when he returned from Mexico." *Matter of Kolk*, 11 I. & N. Dec. at 105.

Because this case involves an agency's interpretation of congressional legislation, as reflected through the lens of Supreme Court precedent, we must defer to the BIA's views so long as they are a reasonable reading of the INA on a question to which Congress has not spoken. *Zalega v. INS*, 916 F.2d 1257, 1259 (7th Cir.1990); *Variamparambil v. INS*, 831 F.2d 1362, 1367 (7th Cir.1987) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). Leal's attempts to criticize the Board's decision as unreasonable, while ably argued, ultimately do not convince us.

Leal argues that an illegal act performed at the very end of a trip cannot vitiate an innocent purpose that attended the excursion up to that point. He cites several decisions suggesting that rule, but there are counterbalancing decisions holding that the time of formation of an illegal purpose is irrelevant to the *Fleuti* analysis. *See, e.g., Cuevas–Cuevas v. INS*, 523 F.2d 883, 884 (9th Cir.1975) (holding, in the case of an alien who helped others illegally cross the border, that his visit lost its innocent purpose when he decided to engage in the unlawful act); *Palatian v. INS*, 502 F.2d 1091, 1093 (9th Cir.1974) (ruling that returning alien who tried to smuggle in twenty-eight bricks of marijuana committed an entry because "[t]he 'purpose of the visit' referred to in *Fleuti* ... may have been innocent when it began, but it was not innocent when [the alien] sought to re-enter this country"); *Bufalino v. INS*, 473 F.2d 728, 731 (3d Cir.) (holding that conscious misrepresentation of citizenship at the time of entry cannot be characterized as an innocent excursion calling for *Fleuti* relief), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973). This court has approved the *Palatian* analysis. *See Lozano–Giron v. INS*, 506 F.2d 1073, 1078 (7th Cir.1974). In sum, whether a trip must be "wholly innocent" to qualify as "innocent, casual, and brief" is an open question to which neither Congress nor the courts have provided a definitive answer. It is thus an issue on which deference to the BIA is particularly appropriate.[7]

---

7. The dissent claims that because Leal later "submitted himself to the INS's authority," it is clear that he had no illegal purpose or intent to break the law when he waded through the Rio Grande. We find this interpretation of events counterintuitive. Leal should not receive credit for notifying INS that it need not bother to mail his notice of exclusion proceedings to Mexico since by that time he had illegally made his way to Chicago. Further, we cannot accept the argu-

Leal also argues that the fact that he sought permission to travel from his probation officer indicates, contrary to the BIA's findings, that he did *not* intend to meaningfully interrupt his permanent residence in this country. Contending that the permission letter would not have caused him to consider the immigration implications of leaving the country, Leal states: "[T]he document in question here was issued by an authority other than the INS, and in fact has no validity under the INA. It is the type of document which often must be secured for travel by *any* parolee, not only aliens who wish to travel across the border, but also United States citizens who wish to travel within this country. *See* 18 U.S.C. § 3651 (1982) (authorizing court to set "terms and conditions of probation")." Petitioner's Brief at 33. Leal's argument has some force, and shows that this *Fleuti* factor may have ambiguous meanings. *See Kamheangpatiyooth v. INS*, 597 F.2d 1253 (9th Cir.1979). Leal is correct that the letter had no legal effect. Not even possession of a reentry permit issued by the Attorney General shields an alien from possible exclusion grounds. *See* 8 U.S.C. § 1203(e) (1988); *cf.* 3 Charles Gordon & Stanley Mailman, *Immigration Law and Procedure* § 71.05[2], at 71–97 to 71–98 ("Even though [returning lawful residents] may have been in possession of proper documents, or were exempted from documentary requirements, and were not otherwise excludable, they may be amenable to expulsion if they failed to undergo proper inspection by immigration officials at the border.") (citations omitted). But Leal's argument undermines much of the equitable force of his position. If this was a document that a probationer must obtain to travel *anywhere*, then it should not have created an expectation on Leal's part that he would be able to pass through an INS inspection point unimpeded. The document gave Leal no reason to believe that his drug conviction would not cause him to be

detained, perhaps indefinitely, at the border.

Leal contends that INS's interpretation of "entry" is not entitled to deference because the BIA has, over time, advanced several different interpretations of "entry" that are not themselves consistent. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987). Leal concedes that in *Matter of Kolk*, the BIA held that a returning alien who entered this country without inspection could not avail himself of the *Fleuti* doctrine. But he raises the decision in *Matter of Wong*, 12 I. & N. Dec. 271 (BIA 1976), which only two years later decided that *Fleuti* applied to applicants for suspension of deportation under 8 U.S.C. § 1254. And he also points to the unpublished decision in *Matter of Romero–Ballesteros*, No. A130 773 096 (BIA Dec. 19, 1990), where the Board stated that "entry without inspection is no longer the type of unlawful conduct that would necessarily render an absence not innocent and therefore 'meaningful.'" *Id.* at 3 (citations omitted).

We are not convinced that the agency has taken different stands on this issue. Since its decision in *Matter of Kolk*, the BIA has reaffirmed its adherence to the principles stated there. *See Matter of Ruis*, 18 I. & N. Dec. 320 (BIA 1982) (holding that a resident alien's deportability for entering without inspection is not overcome by his subsequent departure and readmission). The *Matter of Wong* decision is not inconsistent with *Kolk*. *Wong* applied the *Fleuti* doctrine regarding departures and entries to the requirement that applicants for discretionary suspension of deportation prove continuous residence in this country for seven years. The fact that an alien is deportable for entering without inspection after a short trip says nothing about whether the Attorney General should be vested with the discretion to waive deporta-

ment that if a person turns himself in after knowingly violating the law, he must not have aimed to do anything illegal in the first place. The dissent also argues that Leal could not have intended to give up his residence in the United States, since he had family ties and other con-

nections to this country. We agree. No alien fighting deportation wants to lose his residence in this country. The central fact in this case that determines Leal's deportability is not his subjective intent, but the illegal character of his actions.

tion. As the Supreme Court stated in *INS v. Phinpathya*, 464 U.S. 183, 193, 104 S.Ct. 584, 591, 78 L.Ed.2d 401 (1984), which overruled *Wong* as a misreading of the INA, "*Fleuti* is essentially irrelevant to the adjudications of respondent's § 244(a)(1) suspension application."[8]

*Matter of Romero–Ballesteros* is an unpublished BIA decision; by INS's own regulations, such decisions carry no precedential weight. *See* 8 C.F.R. § 3.1(g) (1992). A survey of unpublished BIA decisions shows that they are treated as limited to their facts. They do not serve as authority for later proceedings involving the same issues, nor do they make new law. It is thus incorrect to say that the BIA has reversed its policy on the deportability of aliens who entered the United States without inspection. We will not bind the BIA with a single non-precedential, unpublished decision any more than we ourselves are bound by our own unpublished orders.[9]

### C.

Ultimately, it does not matter whether we defer to the BIA's interpretation of INA § 101, because we do not believe, as a matter of first principles, that the *Fleuti* doctrine applies to the case of an alien deportable for entering the United States without inspection. To begin with, the inspection process is critical to the integrity of the immigration system. Current regulations require an alien to present himself at a designated port of entry, produce documentation establishing his right to enter the United States, and await completion of the inspection process before entering the country. 8 C.F.R. §§ 235.1 to 235.12 (1992). The purpose of these procedures is "in addition to making a closer examination of [an alien's] right to enter in the first place, [to] require and obtain information and a variety of records that enable [immi-

gration officials] to keep track of the alien after his entry." *Goon Mee Heung v. INS*, 380 F.2d 236, 237 (1st Cir.), *cert. denied*, 389 U.S. 975, 88 S.Ct. 479, 19 L.Ed.2d 470 (1967).

The legislative history of the INA reveals that Congress viewed entry without inspection to be one of "the more important grounds for deportation." H.R.Rep. No. 1365, 82d Cong., 2nd Sess. (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1715; *see also Gunaydin v. INS*, 742 F.2d 776, 778 (3d Cir.1984); *Bufalino v. INS*, 473 F.2d 728, 731 (3d Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973). In fact, Congress mandated criminal penalties for "any alien who ... eludes examination or inspection by immigration officers...." 8 U.S.C. § 1325(a) (1988). The INA, when enacted, even eliminated the previous time limitation on deportations after entries without inspection, thus subjecting aliens to deportation for entries that occurred as many as thirty years earlier. *See Barber v. Hong*, 254 F.2d 382 (9th Cir.1958). To this day, entry without inspection remains one of the most frequently invoked grounds for deportation. *See* 3 Gordon & Mailman, *supra*, § 71.01[2][a], at 71–6 (1992).

We believe that *Fleuti* should not be read as altering this solid statutory framework. *Fleuti* was concerned with the inequities to which strict application of the reentry doctrine gives rise—the fact that, because of the disparity between the grounds that support exclusion and those that support deportation under the INA, a returning resident alien could be excluded from this country for reasons that would never have caused him immigration troubles at home. *See* Sam Bernsen, *The Reentry Doctrine 20 Years After Fleuti*, Immigr. J., Apr.—June 1983, at 7. The idea that a penalty as severe as the loss of his right to live in this country should depend

---

**8.** Congress effectively overruled *Phinpathya* in section 315(b) of the Immigration Reform and Control Act of 1986. Passage of that statute changes nothing in this analysis, however. *See* n. 10 *infra*.

**9.** Even if *Romero–Ballesteros* had been a precedential decision, it would not help Leal. The

case states that entry without inspection does not *necessarily* render an absence "meaningful" under *Fleuti*. Leal's decision to cross the border even after being turned away and told to wait for his exclusion hearing would undercut a finding that his trip was innocent.

on an alien's unsuspecting wanderings— whether he happens to set foot over the border for even a moment—was repugnant to the Court. Hence, it created the fiction that no entry occurs after an "innocent, casual, and brief" trip in order to shield certain returning aliens from the unexpected obstacles they might face under the exclusion provisions of the INA on their way back to the United States.

Deportation for entering without inspection is a different kind of penalty—it punishes an alien for flouting the immigration laws during his trip, not for having engaged earlier in apparently innocuous behavior. Fleuti was being deported for a previously existing condition that, unexpectedly, ripened into a ground for exclusion when he crossed into Mexico. Leal, by contrast, is being deported for violating a requirement to which every returning alien is subject. Aliens are charged with knowing that they must pass through inspection points at the border, and Leal himself knew that he was so obligated, as shown by his decision to wade through the Rio Grande after one frustrated attempt to reenter. The deportation Leal faces for entering without inspection was not, as in *Fleuti*, an "unsuspected risk[ ] and unintended consequence[ ] of ... a wholly innocent action," *Fleuti*, 374 U.S. at 462, 83 S.Ct. at 1812, nor was Leal "walking into a trap," *id.* at 461, 83 S.Ct. at 1811. This ground for deportation simply did not place him at the mercy of the same "sport of chance" or "meaningless and irrational hazard," *id.* at 460, 83 S.Ct. at 1811, about which the *Fleuti* Court worried.

It is true that the *Fleuti* doctrine has enjoyed life in other immigration contexts, such as the suspension of deportation and legalization processes.[10] But Congress has never indicated that entry without inspection falls within the scope of *Fleuti*. It certainly has never shown an intention to exempt an entire class of aliens from the universal requirement that non-citizens undergo inspection when they seek admission into this country. For us to do so today would be to establish a rule that such aliens can simply ignore immigration checkpoints when they return from trips abroad. It is difficult to accept that the *Fleuti* Court, even if aiming to "ameliorate the severe effects of the strict 'entry' doctrine," *id.* at 462, 83 S.Ct. at 1812, meant to fashion a rule that so undermines a fundamental policy of immigration law.

Whether *Fleuti* shields resident aliens from deportation for entering this country without inspection after short trips abroad is a matter of first impression in the circuit courts. In *Zimmerman v. Lehmann*, 339 F.2d 943 (7th Cir.), *cert. denied*, 381 U.S. 925, 85 S.Ct. 1559, 14 L.Ed.2d 683 (1965), this court held that *Fleuti* did protect an alien who had a previous criminal conviction and attempted to enter the United States without proper documentation—but from *exclusion* proceedings, not deportation. In another case, *Yanez–Jacquez v.*

---

**10.** Section 315(b) of the Immigration Reform and Control Act of 1986, Pub.L. 99–603, 100 Stat. 3359 (1986) (IRCA), amended the INA to incorporate the *Fleuti* doctrine into the suspension of deportation process, while section 201 incorporated *Fleuti* into IRCA's legalization program. Applicants for discretionary suspension of deportation must show that they have been physically present in the United States for a continuous period of seven or ten years, but section 315(b) of IRCA provides that "innocent, casual, and brief" absences will not be considered to interrupt this period. *See* 8 U.S.C. § 1254(b)(2) (1988). Applicants for legalization were also required to show that they had been continuously physically present in the United States since November 6, 1986, but any "brief, casual and innocent" absences since that time were not considered to interrupt those periods. *See* 8 U.S.C. §§ 1255a(a)(3)(A), (B) (1988).

Leal observes that both amendments addressed absences by aliens in undocumented status—aliens who likely effected illegal or fraudulent entries. He contends that the amendments thus evidence Congress' recognition that entry without inspection, by itself, does not preclude a finding that a foreign excursion is "innocent, casual, and brief." But IRCA revised the meaning of "continuous physical presence" in these two contexts, not the INA's definition of "entry." The fact that Congress made two forms of discretionary relief available to aliens who accomplished illegal entries does not show that it intended them to be any less deportable. Rather, the Attorney General's discretionary power to waive deportation in these cases presupposes that expulsion is otherwise the appropriate penalty.

*INS*, 440 F.2d 701 (5th Cir.1971), an alien had crossed the border into Mexico to seek revenge on robbers with an icepick and returned later the same day by way of the Rio Grande. He was subsequently found guilty of uttering a forged instrument and judged deportable for being convicted of a crime involving moral turpitude committed within five years after entry. The Fifth Circuit reversed, holding that under *Fleuti* no entry had occurred. In this case, too, the alien was not threatened with deportation for entry without inspection. *See also Laredo–Miranda v. INS*, 555 F.2d 1242, 1245 n. 5 (5th Cir.1977) (declining to rule that any resident alien who returns without inspection makes an entry).

The Third Circuit has indicated that it views the legislative history of the INA and pertinent case law as supporting strict application of the reentry doctrine. *See Gunaydin v. INS*, 742 F.2d 776 (3d Cir. 1984) (holding that subsequent entry with inspection does not nullify prior deportation ground of entry without inspection); *Bufalino v. INS*, 473 F.2d 728, 731 (3d Cir.) (holding that false claim of citizenship to avoid inspection cannot be characterized as innocent excursion calling for application of *Fleuti*), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973). One leading authority has concluded that despite *Fleuti*, returns without inspection even after short trips abroad qualify as entries. *See* 3 Gordon & Mailman, *supra*, § 71.03[6][b], at 71–52 to 71–53 & n. 75. We, too, believe

that the *Fleuti* doctrine should not apply to cases of entries without inspection.

### III.

■ Having found Leal deportable due to his entry without inspection, we now face the question of his eligibility for discretionary relief from deportation. As discussed above, both the statutory provisions involving exclusion and those involving deportation grant discretion to the Attorney General to waive most grounds supporting action against an alien. Section 212(c) (waiver of exclusion) and section 244 (suspension of deportation) are similar in effect, but the threshold requirements for applying the latter are far more stringent. Aliens seeking relief from deportation must have been physically present in the country for seven years (in some cases, ten) following commission of the act constituting a ground for deportation; they must be of "good moral character"; and they must show that deportation would cause them extreme hardship. 8 U.S.C. § 1254(a) (1988). (The second and third factors are not required for waiver of exclusion.) Because the test for extreme hardship is difficult to meet, *see Hernandez–Patino v. INS*, 831 F.2d 750, 752–55 (7th Cir.1987); *Marquez–Medina v. INS*, 765 F.2d 673, 676–77 (7th Cir.1985), in practice, this provision may not afford discretionary relief to all deportable aliens.[11]

In accordance with its literal language, section 212(c) originally offered relief only to aliens subject to exclusion.[12] The INS,

---

**11.** Subsequent to oral argument in this appeal, Leal's counsel informed us that she filed a motion to reopen deportation proceedings to afford Leal an opportunity to apply for suspension of deportation. Letter from Susan Compernolle, Attorney for Petitioner, to Thomas F. Strubbe, Clerk of the Court (Feb. 11, 1993) at 1. Leal became eligible for such relief on January 6, 1993, ten years to the day after his illegal entry into the United States. As we recently held, the pendency of a motion to reopen an order of deportation does not defeat our appellate jurisdiction. *Rhoa–Zamora v. INS*, 971 F.2d 26, 32–33 (7th Cir.1992); *see also Berroteran–Melendez v. INS*, 955 F.2d 1251, 1255 (9th Cir.1992). Hence, we will issue judgment in this case, cognizant of the fact that Leal, if he meets the statutory eligibility requirements for suspension of deportation, may yet have a chance to show

the humanitarian interest in his continued residence in this country.

**12.** Section 212(c) provides:

Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of paragraphs (1) to (25), (30), and (31) of subsection (a) of this section. Nothing contained in this subsection shall limit the authority of the Attorney General to exercise the discretion vested in him under section 1181(b) of this title.

8 U.S.C. § 1182(c) (1988).

however, allowed aliens to apply for section 212(c) relief who, subsequent to deportability, departed and reentered the United States. The theory was that if INS inadvertently allowed a resident alien to reenter the country despite his excludability and then, subsequently, initiated deportation proceedings, the alien should not be placed in a worse position than if he had been excluded in the first place. *See Matter of G— A—,* 7 I. & N. Dec. 274 (BIA 1956); *Matter of S—,* 6 I. & N. Dec. 392 (BIA 1954; Att'y Gen.1955). Equitable though the theory may have been in principle, it yielded an inequitable result. One resident alien who became deportable and then left the country and reentered would suddenly become eligible for discretionary relief; another resident alien who was deportable for the same reason but stayed home had no recourse. Finding this distinction "not rationally related to any legitimate purpose of the statute," the Second Circuit in 1976 struck it down as violative of the Due Process Clause of the Fifth Amendment. *Francis v. INS,* 532 F.2d 268, 272 (2d Cir.1976). The BIA subsequently adopted this reasoning in *Matter of Silva,* 16 I. & N. Dec. 26 (BIA 1976), and extended section 212(c) relief to deportable aliens regardless of whether they had departed the United States since the commission of the act rendering them deportable.[13]

Under *Francis*'s and *Silva*'s rationale, certain deportable aliens may receive exclusion-type relief as if they were subject to exclusion rather than deportation. But that fiction requires that the aliens be excludable for the same reasons that render them deportable—a situation not necessarily true for all aliens facing deportations. Accordingly, section 212(c) relief was not extended to aliens whose deportability was

based on a ground for which a comparable ground of exclusion did not exist. *See. Matter of Wadud,* 19 I. & N. Dec. 182, 184 (BIA 1984); *Matter. of Granados,* 16 I. & N. Dec. 726 (BIA 1979). Several courts of appeals have accepted this view, including this one. *See, e.g., Variamparambil v. INS,* 831 F.2d 1362, 1364 n. 1 (7th Cir.1987).

In 1990, the BIA unexpectedly reversed its position on this issue, holding that section 212(c) relief is available to all aliens facing deportation, whatever the ground. *See Matter of Hernandez–Casillas,* — I. & N. Dec. —, Int. Dec. 3147 (BIA Jan. 11, 1990) (*Hernandez–Casillas I*). The case there, as here, involved entry without inspection—a ground for deportation which, as a matter of logic, cannot be a ground for exclusion, since the moment the violation occurs the offender is already inside the United States. Unfortunately for Leal, the Attorney General overturned the decision. *See Matter of Hernandez–Casillas,* — I. & N. Dec. —, Int. Dec. 3147 (Att'y Gen. Mar. 18, 1991) (*Hernandez–Casillas II*).[14] The Attorney General recognized that *Silva* had already distorted the text of section 212(c) to some extent. But, he explained, "*Silva* at least remains tied, albeit loosely, to the statutory text, because it permits waivers of only those grounds for deportation that Congress expressly made waivable in the related context of exclusion." *Id.* at 37. To extend relief to other classes of deportable aliens would only further disrupt Congress's scheme for awarding discretionary relief, which deliberately set the eligibility bar higher in cases of deportation than those involving exclusion. The Attorney General explained that such a result was not required under the guarantee of equal protection that undergirded *Francis* and *Silva.* Unlike the situation in those

13. One other situation in which section 212(c) relief is available arises when an alien calls upon the Attorney General to grant a discretionary adjustment of status under section 245(a). *See* 8 U.S.C. § 1255(a) (1988); *Matter of Smith,* 11 I. & N. Dec. 325, 326–27 (BIA 1965) ("An applicant for adjustment of status under section 245 stands in the same position as an applicant who seeks to enter the United States."). That provision has no application here because it is available only to an alien "who was inspected

and admitted or paroled into the United States." 8 U.S.C. § 1255(a) (1988).

14. Congress vested the Attorney General with the authority to rule on legal questions arising from the immigration laws. *See* 8 U.S.C. § 1103(a) (1988). The Attorney General has delegated this function to the BIA in the first instance, while retaining authority to review final decisions either upon his own initiative or by request. *See* 8 C.F.R. § 3.1(h) (1992).

cases, "[h]ere, deportation turns not upon the 'irrelevant circumstance' of whether the respondent has temporarily left the United States but, instead, upon the illegal nature of his reentry." *Id.* at 39. The Attorney General concluded that equal protection justified no more than the *Silva* result. Two circuit courts have agreed with this decision. *See Campos v. INS*, 961 F.2d 309 (1st Cir.1992); *Cabasug v. INS*, 847 F.2d 1321 (9th Cir.1988) (decided before *Hernandez–Casillas II* ).

In Leal's case, the BIA found that *Hernandez–Casillas II* precluded any discretionary relief under section 212(c). Leal now argues that we should not follow the Attorney General's decision. As we discussed in the *Fleuti* context in part II, we must defer to the Attorney General's interpretation if it is reasonable. *Zalega v. INS*, 916 F.2d 1257, 1259 (7th Cir.1990); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Leal advances several arguments that it is not. He argues first that the text of section 212(c) supports extension of discretionary relief to all deportable aliens. Citing the language in section 212(c) providing that aliens may be admitted "in the discretion of the Attorney General *without regard to the provisions of ... subsection (a) of this section,*" 8 U.S.C. § 1182(c) (emphasis added), Leal claims the text itself indicates that the enumerated grounds for exclusion are "irrelevant" to the question of whether relief should be granted. Hence, he contends, once section 212(c) is made available to any alien facing deportation, it should be extended to all deportable aliens, whatever their ground for expulsion. *Cf. Marti–Xiques v. INS*, 713 F.2d 1511, 1516 n. 5 (11th Cir.1983) ("If § 212(c)'s failure to mention deportation proceedings generally has no significance, then its omission of any reference to grounds of deportation likewise has no significance."), *vacated on reh'g*, 724 F.2d 1463 (11th Cir.1984), *modified*, 741 F.2d 350 (11th Cir.1984).

We consider this semantic argument wholly unconvincing. The point of the wording in section 212(c) is to explain that discretionary relief is available to certain classes of returning aliens notwithstanding the statutory language, contained in the preceding subsections, that such aliens "*shall* be excluded from admission into the United States." 8 U.S.C. § 1182(a) (emphasis added). Only aliens excludable on the specified grounds are eligible for relief. In that sense, those grounds are obviously quite relevant to (indeed, dispositive of) the availability of relief in exclusion proceedings. *Francis* and *Silva* hold that the same rule applies when the forum is a deportation proceeding.

Leal claims that sections 545 and 601 of the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978 (1990), buttress his textual argument that Congress intended relief to be available even to aliens deportable on grounds for which no comparable ground of exclusion exists. Section 545 states that aliens who do not appear at deportation or asylum-related proceedings are not eligible for section 212(c) relief. *See* 8 U.S.C. § 1252b(e)(1), (5) (1988 & Supp. II 1990). Leal reasons from this that Congress recognized that section 212(c) relief is available to aliens in deportation proceedings. Section 601 amended section 212(c) itself, to add that an alien convicted of an "aggravated felony" is barred from receiving discretionary relief if he has served a term of imprisonment of at least five years. *See* 8 U.S.C. § 1182(c) (1988 & Supp. III 1991). According to Leal, this proviso suggests that aliens convicted of aggravated felonies who have *not* served five-year terms *are* eligible for section 212(c) relief. But conviction of an aggravated felony is a ground of deportation, *see id.* § 1251(a)(2)(A)(iii), without being a ground of exclusion. Thus, he concludes, Congress recognized that section 212(c) relief may be available in cases of deportation where there is no parallel ground of inadmissibility.

None of this helps Leal, since the 1990 amendments apply only to admissions occurring after the date of enactment, while Leal's entry occurred more than seven years earlier. But we also note that the amendments do not support Leal's reading

of the statute. Section 545 simply acknowledges that section 212(c) is available in deportation hearings—a point that has never been in dispute. In any case, section 545 was repealed.[15] Leal's chain of inferences about the significance of section 601 is also highly dubious. The fact that Congress added a slight limitation on who may receive relief under section 212(c) goes little distance toward showing its intent to make that provision applicable to all deportable aliens. Leal's arguments "would require us to read nonexistent language into § 212(c) on the shaky supposition that, although Congress made no directly relevant statutory change, it must be presumed somehow to have signaled that a statute saying one thing should now—although unchanged—be understood to say something else." *Campos v. INS,* 961 F.2d 309, 315 (1st Cir.1992). We decline to do so.[16]

■ Finally, Leal raises the constitutional objection that the Attorney General's construction violates the equal protection component of the Fifth Amendment Due Process Clause. Leal complains that there is no legitimate governmental interest that justifies denial of section 212(c) relief to him when it is available to those who have committed major drug offenses and other serious crimes. He admits that this court's authority to review congressional immigration legislation is exceedingly narrow. As the Supreme Court has repeatedly emphasized, " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell,* 430 U.S. 787, 792,

97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)). Whether an immigration provision is constitutional depends only on the existence of a " 'facially legitimate and bona fide reason' " for its enactment. *Id.* 430 U.S. at 794, 97 S.Ct. at 1479 (quoting *Kleindienst v. Mandel,* 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972)).

■ Leal's argument that there is no "facially legitimate and bona fide reason" comes in two parts. First, he claims that Congress could not have intended to deny section 212(c) relief to aliens who have entered without inspection because it never even *considered* whether such relief should be extended to them. Indeed, it intended *no* aliens facing deportation to receive section 212(c) relief. Second, he contends that there is no evidence that Congress thought entry without inspection was an offense more serious than any other ground for deportation. He points out, for example, that discretionary relief in the form of voluntary departure is available to aliens who are deportable without inspection, but not to aliens subject to most other grounds of deportation. *See* 8 U.S.C. § 1254(e) (1988).

Leal's first point, obviously, is true. That section 212(c) relief is available in deportation hearings at all is a product of judicial decisions, not legislative ones. Congress did not choose the present scheme for awarding section 212(c) relief; *a fortiori,* it did not choose to make any

**15.** Section 545 was eliminated by section 306(c)(6) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub.L. No. 102–232, 105 Stat. 1733 (1991).

**16.** Leal also suggests that Congress acquiesced in the BIA's original interpretation. He observes that when the Immigration Act of 1990 was passed and signed into law, the most authoritative statement of governing law was the *Hernandez–Casillas I* decision. Congress, so the argument goes, is presumed to have been aware of this interpretation and to have endorsed it when passing the 1990 Act. The Attorney General properly rejected this argument in *Hernandez–Casillas II.* The doctrine of congressional

acquiescence, although perhaps enjoying some favor in the Supreme Court at one time, has recently fallen victim to plain meaning jurisprudence. The Court has lately stated: "It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of [a court]'s statutory interpretation.... Congressional inaction cannot amend a duly enacted statute." *Patterson v. McLean Credit Union,* 491 U.S. 164, 175 n. 1, 109 S.Ct. 2363, 2371 n. 1, 105 L.Ed.2d 132 (1989) (quoting *Johnson v. Transportation Agency,* 480 U.S. 616, 671–72, 107 S.Ct. 1442, 1472–73, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting)). We therefore reject Leal's contention.

individual ground for deportation, such as entry without inspection, a basis for waiver of exclusion. The second point then follows. Congress had no occasion to single out entry without inspection as the worst transgression deserving deportation, since it intended section 212(c) to apply to none of the grounds.

We are reluctant, however, to conclude that once the initial judicial extension of waiver of exclusion relief was made from *no* grounds for deportation to *most* grounds for deportation, further action by the judiciary must be taken to expand section 212(c) to cover *all* grounds. The impetus for taking the first step, in *Francis* and *Silva*, was the arbitrariness of allowing the availability of relief to depend on whether an alien left the country and returned after becoming deportable. No such justification exists for taking the second step. To hold that the same form of discretionary relief must be available to aliens deportable for different, but arguably comparable, violations is to interfere again, on an even weaker rationale, with Congress's scheme for regulating aliens. In a thoughtful decision affirming the noneligibility for section 212(c) relief of aliens facing deportation for illegal possession of firearms, the First Circuit reached the same conclusion.

> To be sure, when to avoid perceived equal protection problems the statute was stretched beyond its language to apply to deportation proceedings, problems crept in. If impatience with the legislative language had not resulted in adding nonexistent provisions to the statute in the first place, Congress would likely have recognized the defects and long ago repaired any problems at the instance of the Attorney General, the INS and those concerned with the welfare of resident aliens. The question now becomes whether to engage in a second judicial rewriting of the statute in order to improve upon the first rewriting.... Continued judicial redrafting simply insures that the statute will less and less be the recognizable product of the legislative will. We think a statute of this detailed nature is best left to the

ministrations of the Congress. We decline to tinker further.

*Campos*, 961 F.2d at 316–17. We therefore leave the Attorney General's decision intact and hold that section 212(c) relief is not available to Leal.

### IV.

For the foregoing reasons, the judgment of deportation based on Leal's entry without inspection and the denial of section 212(c) relief are AFFIRMED.

CUMMINGS, Circuit Judge, dissenting.

Miguel Leal–Rodriguez is a legal resident alien who has lived in this country for twenty-two years. His wife and two daughters are U.S. citizens. In 1983, he travelled briefly to Mexico to visit an ailing grandfather after obtaining express written permission from his probation officer and a federal district judge. When the Immigration and Naturalization Service (INS) refused to allow him back into the United States, he crossed the border illegally because his daughter was in the hospital, and he believed the permission of his probation officer would resolve his problems with the INS once he returned to the United States. Against the obvious import of these facts, the majority today concludes that Leal intended to interrupt his status as a lawful resident alien and therefore that he is not entitled to equitable relief from deportation offered by *Rosenburg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, and § 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c). Equity and common sense counsel rejecting the majority's result, and because their opinion also disturbs the well-settled logic of precedents following *Fleuti*, I respectfully dissent.

The dispositive question in this case is whether when Leal returned to the United States by crossing the border illegally, he made a statutory "entry" under the immigration laws as defined by § 1101(a)(13) and interpreted by *Fleuti*, 374 U.S. 449, 83 S.Ct. 1804. As the majority points out, we defer to the Board of Immigration Appeals' (BIA) interpretation of § 1101(a)(13) if it is reasonable. *Zalega v. INS*, 916 F.2d 1257,

1259 (7th Cir.1990); *Variamparambil v. INS*, 831 F.2d 1362, 1366 (7th Cir.1987). For reasons set forth below, I would hold that *Fleuti* applies to Leal's trip and that the BIA's application of § 1101(a)(13) to Leal was unreasonable.

I agree with the majority's statement in Part II(A) of the opinion that "returns to this country will not count as 'entries' [under immigration law] if they follow foreign excursions that are 'innocent, casual and brief.'" Parts II(B) and II(C) of the opinion are more problematic. In Part II(B), the majority endorses the BIA's conclusion that under *Palatian v. INS*, 502 F.2d 1091 (9th Cir.1974), *Cuevas–Cuevas v. INS*, 523 F.2d 883 (9th Cir.1975), and *Matter of Kolk*, 11 I & N Dec. 103 (BIA 1965), *Fleuti* should not apply to Leal's trip. In my view, Part II(B) is flawed because it ignores cases holding that *Fleuti* covered trips no less "innocent, casual and brief" than Leal's. In Part II(C), the majority concludes that we need not conduct a *Fleuti* analysis in this case because *Fleuti* does not apply to those immigration laws proscribing entry without inspection.[1] This also seems incorrect. *Fleuti* governs all immigration law on entries because it interprets the definition of "entry." I submit that Parts II(B) and II(C) of the majority's opinion distort and rigidify *Fleuti*, undermining its authority as a precedent.

The majority is able to assert that *Fleuti* does not apply to entry without inspection only because it treats *Fleuti* as a court-created equitable doctrine. *Fleuti* is no such thing—it interprets a statute, and that interpretation binds this Court whether we like it or not. Returning to that statute for a moment, 8 U.S.C. § 1101(a)(13) defines an "entry" as "*any* coming of an alien into the United States" (emphasis added). It qualifies this statement:

> [A]n alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for purposes of the immigration laws if the alien proves to the

satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended * * *.

This Court has noted before that passive constructions can leave a statute subject to varying interpretations. *Sherman v. Community Consolidated School District 21 of Wheeling Township*, 980 F.2d 437, 442 (7th Cir.1992). Such is the case with § 1101(a)(13). That a "departure * * * was not intended" could mean simply that the alien left the country against his or her will—by falling asleep in a train, for example. Or the text could mean that an alien would not be regarded as making a statutory entry if he did not intend to depart from the United States in any permanent sense. In other words, the text could mean that resident aliens could make short trips abroad without fear of exclusion on their return. *Fleuti* expressly adopted this more permissive reading of § 1101(a)(13).

Section 1101(a)(13) is part of a "definitions" section that precedes the substantive provisions of the immigration laws. When definitions of a word appear in such a section, they apply wherever that particular word is used in the statute. For example, Title VII defines "employee" at 42 U.S.C. § 2000e–(f) in a definitions section that precedes all Title VII's substantive provisions. No court would find that this definition of "employee" applied to some substantive rules in Title VII but not to others. The majority's conclusion in Part II(C) that *Fleuti* never applies to entry without inspection is therefore baffling. The question of whether an "entry" occurred must be answered before considering whether that entry violated our admittedly important laws against entry without inspection.

I believe that the majority also errs in Part II(B), where it endorses the BIA's conclusion that Leal's trip is not "innocent, casual and brief" when analyzed under *Fleuti*. Part II(B) begins by deferring to *Matter of Kolk*, 11 I & N Dec. 103 (BIA

---

**1.** Part III concludes that Leal is not entitled to a § 212(c) waiver for entry without inspection. My analysis would not reach this question.

Therefore there is no need to discuss that portion of the majority's opinion.

1965), as a binding expression of the BIA's view that entry without inspection always interrupts an alien's permanent residence under *Fleuti*. Cases in this and other circuits have not focused on any one factor to determine whether a trip is innocent under *Fleuti*, so that it can be argued that such cases overrule *Kolk sub silentio*. *Lozano–Giron v. INS*, 506 F.2d 1073 (7th Cir.1974); *Yanez–Jacquez v. INS*, 440 F.2d 701 (5th Cir.1971). We need not proceed this far to decide that *Kolk* does not bind this Court, however. A recent BIA decision concluded that "entry without inspection is no longer the type of unlawful conduct that would necessarily render an absence not innocent and therefore 'meaningful'." *Matter of Romero*, No. A30–773–096 (BIA December 19, 1990). The majority states that by declining to publish *Romero* as a precedent decision the BIA showed that it still subscribes to *Kolk*. This is backwards. By utterly ignoring *Kolk*, *Romero* proves that the BIA no longer treats *Kolk* as binding. Even if *Kolk* is still the BIA's "official" position, this Court is not bound by *Kolk* because the BIA was not bound by *Kolk* in *Romero*. It escapes me why this Court should be more deferential to *Kolk* than the BIA itself, especially when the methods of our cases after *Kolk* cast doubt on its conclusion. The analysis that follows explains why I disagree with Part II(B) of today's opinion, why *Kolk* is bad law, and why Leal's trip satisfies *Fleuti*'s standards.

*Fleuti* reviewed the application of § 1101(a)(13) to a legal resident alien who went to Mexico for a few hours. As the majority explains, the INS tried to deport Fleuti because he was excludable as a homosexual when he returned to the United States from Mexico. The Supreme Court concluded that his brief trip to Mexico was not an "intended departure" under § 1101(a)(13). *Id.* 374 U.S. at 463, 83 S.Ct. at 1812. Fleuti obviously had not been dragged over the border to Mexico against his will. What the Supreme Court meant, and what appellate courts for twenty years have understood *Fleuti* to mean, is that under § 1101(a)(13), long-term resident aliens may make short trips abroad without being subjected to the consequences of an "entry" on their return as long as their actions do not "meaningfully interrupt[ ]" their status as lawful resident aliens. *Id. Fleuti* held that "innocent, casual and brief" trips like Leal's do not force aliens to make a statutory "entry" on their return.

If Leal's trip is as "innocent, casual and brief" as trips in earlier cases where *Fleuti* applied, *Fleuti* applies here. If Leal's trip resembles cases where *Fleuti* did not apply, *Fleuti* does not apply here. The majority avoids this simple analysis, concluding instead that *Fleuti* only applies where an alien had no notice prior to travel that he might be excludable upon his return. For the majority, an illegal entry, no matter what its surrounding context, bars *Fleuti*'s application to a trip where that entry occurred. No court has held this before, and nothing about Leal's case suggests a need for such constricting innovation.

*Yanez–Jacquez v. INS*, 440 F.2d 701 (5th Cir.1971), rebuts the majority's suggestion that a single illegal entry means that a trip can no longer be "innocent, casual and brief" under *Fleuti*. Yanez crossed the Mexican border with an ice pick for the dubious purpose of seeking revenge on a thief, and he did not return to the United States via an INS check point. The INS argued that Yanez's action showed an intent contrary to the policy of U.S. immigration law. *Id.* at 704. The court ignored the fact that Yanez re-entered the United States by wading the Rio Grande instead of passing the INS's inspection point at the Santa Fe bridge, and focused instead on the ice pick and the purpose of Yanez's trip. The court wrote:

> We agree petitioner's purpose was less than salutary in nature. *We disagree, however, that this one factor* [i.e. crossing the border with the ice pick] *is controlling.* We think that application of the other factors outlined in *Fleuti* point[s] markedly to a conclusion that the petitioner did not intend by the trip to Juarez to interrupt his status as a resident alien.

*Id.* (emphasis added). The same is true of Leal's trip to Mexico. One adverse factor, his crossing the border between inspection points, does not control the resolution of his case. Leal's act is more excusable than Yanez's because Leal was driven by a legitimate desire to return home to his hospitalized daughter.

Leal's situation is also close to the facts of *Zimmerman v. Lehman,* 339 F.2d 943 (7th Cir.1965), which applied *Fleuti* to an alien who went to Canada on a brief trip and claimed to be a United States citizen when he was stopped at the border on his return. He was not a citizen—but his wife was, his three children were, and he claimed to believe that after thirty-five years in the United States, he was too. The INS tried to deport him for "attempt[ing] to enter the United States without a visa * * *." *Id.* at 944–945. This Court would not allow it:

> [Zimmerman] was married to an American citizen, had three minor children who were born in this country, all dependent upon him for support, and had a residence and business in Chicago. From the fact that he took his family on an innocent, harmless vacation trip to Canada, it would border on the absurd to ascribe to him an intention of impairing his status as a permanent resident of this country.

*Id.* at 948–949. Leal, like Zimmerman, had a good faith reason to believe he could return to the United States. His river crossing at the border should not by itself erase the otherwise innocent character of his entire trip.

The majority cites two Ninth Circuit cases, *Cuevas–Cuevas v. INS,* 523 F.2d 883 (9th Cir.1975), and *Palatian v. INS,* 502 F.2d 1091 (9th Cir.1974), for the proposition that Leal's illegal entry bars *Fleuti* from applying to his trip. The alien in *Palatian* was caught at the border with fifty-five pounds of marijuana. *Id.* at 1091–1092. *Palatian* held that *Fleuti* did not apply because the alien was " 'attempting to accomplish some object which is itself contrary to some policy reflected in our immigration laws.' " *Id.* at 1093, quoting *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812. It is

absurd to suggest that Leal resembles the alien in *Palatian,* who tried to smuggle huge quantities of drugs across the border. The alien in *Cuevas–Cuevas* was caught guiding other illegal aliens across the border for a fee. Both cases thus are different from Leal's in that they involve illegal action apart from the entry itself.

*Fleuti* offered several factors beyond the words "innocent, casual and brief" to help courts determine whether an alien's trip interrupted his resident status, and Leal's trip satisfies this more detailed *Fleuti* scrutiny as well. First we must consider the duration of Leal's trip abroad. The trip in *Fleuti* lasted a few hours, while *Lozano–Giron v. INS,* 506 F.2d 1073 (7th Cir.1974), declined to apply *Fleuti* to a month-long trip. *Zimmerman,* 339 F.2d 943, held that a two-week trip like Leal's was sufficiently "brief" to be covered under *Fleuti.*

A second factor stressed by *Fleuti* is whether an alien needs travel documents to go abroad. The INS argues that because Leal needed permission from the district court and his probation officer to travel, *Fleuti* does not apply to Leal's trip. Recall *Fleuti*'s exact words on this point, however, and the INS's argument supports the opposite position: "Still another [factor to be considered] is whether the alien has to procure any travel documents in order to make his trip, *since the need to obtain such items might well cause the alien to consider more fully the implications involved in his leaving the county.*" 374 U.S. at 462, 83 S.Ct. at 1812 (emphasis added). The proper question is whether Leal's need for permission from his probation officer should have alerted him to the "implications" of leaving the country. The answer: of course not. Because Leal was on probation, he could not have travelled at all without permission.

The majority argues that Leal would have needed permission to travel "anywhere" and therefore he could not assume that a letter from his probation officer would resolve any immigration problems raised by his trip to Mexico. This defies common sense. Although we do not know

the letter's contents, it seems likely that the permission Leal sought and obtained from his probation officer involved travel to Mexico. Leal would hardly know that federal judges cannot grant immigrants permission to cross international borders. Most people, aliens or no, would take it on faith that when, as here, a federal judge gives you permission to travel out of the country, you may do so. There is no reason to question Leal's good faith belief that the letter allowed him to travel freely to Mexico and back.

A third and crucial factor under *Fleuti* is whether the alien's actions over the course of his entire trip show an intent to remain a lawful, permanent U.S. resident. Leal's actions do. When Leal took the letter from his probation officer with him on his trip, he showed his intent to return to his family and abide by the laws of the United States. He further assumed the letter would clear the difficulties he encountered at the border. His one illegal act—entry without inspection—must be viewed in the context of his entire trip. The majority appears to assume Leal's trip ended when he waded the Rio Grande, but it did not. When he returned home, he contacted a lawyer who notified the INS that Leal was no longer in Mexico. Leal did not vanish from the INS's jurisdiction. After hurrying to the bedside of his hospitalized daughter, he submitted himself to the INS's authority and tried to resolve his immigration status. Taken together, the facts of Leal's trip—permission from his probation officer and a district judge to travel to Mexico and back, a hospitalized daughter, submission to the INS in Chicago—suggest that he did not have an illegal aim or intent when he crossed the border without inspection.

*Lozano–Giron v. INS*, 506 F.2d 1073 (7th Cir.1974), supports this analysis of Leal's intent. There we reviewed several *Fleuti* factors to conclude that Lozano made an entry under § 1101(a)(13). Lozano had left the country three times, from one to three months each time, the last time to marry. Marriage abroad suggested to this Court that Lozano did not plan to return, and therefore that he meaningfully interrupted his status as a lawful resident alien. We

thus considered Lozano's ties to the United States as part of our *Fleuti* analysis. Leal's family ties here argue powerfully that he intended to retain his resident alien status. Only one aspect of his trip, the border crossing, even suggests the contrary.

The majority apparently reads this dissent to argue that an alien's subjective intent controls whether a trip is innocent under *Fleuti*. I argue no such thing. The issue under *Fleuti* is whether a court can find that an alien's actions meaningfully interrupted his or her resident alien status in the context of an entire trip. This Court's analysis in *Zimmerman* and *Lozano–Giron* shows that an alien's subjective intent is an important but not determinative element of a court's objective analysis of the alien's entire trip.

In summary, three points underscore the conclusion that *Fleuti* should apply to Leal's trip. First, Leal had permission from his probation officer and a district court to travel. It would be grossly unjust if Leal lost an equitable hearing on his deportation because he thought this permission would allow him to resolve his immigration problems here instead of in Mexico. Second, Leal did not attempt to avoid the INS's jurisdiction by crossing the border illegally. When he returned home, he immediately contacted the INS to resolve his immigration status. Aliens who "enter without inspection" usually do so to avoid the INS, and strict regulation of illegal entries aims to punish those who attempt to evade the INS, not those who submit to the INS. Finally, a decision in Leal's favor would not reward illegal entry. If Leal had waited in Mexico as the INS ordered, he could have applied for § 212(c) relief from exclusion. Thus if the majority held that Leal's trip was innocent under *Fleuti*, he would only regain the chance to apply for § 212(c) relief, and the INS would still be able to argue that he should be deported for a thirteen-year-old drug conviction.

A holding in Leal's favor would not legalize entry without inspection, as the majority seems to fear. If facts similar to Leal's trip were not present in a future case, a

court following a decision in Leal's favor would not be compelled to find that an illegal entry was innocent. Accordingly, I dissent because Leal's actions show that he did not intend meaningfully to interrupt his status as a legal resident alien, and therefore he did not make a statutory entry. I would vacate the order of deportation based on entry without inspection and remand Leal's case for a § 212(c) hearing to review the equities of deporting him for his prior drug conviction.