67 F.3d 301
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Jose L. GAMBOA-GARIBAY, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 94-3399.
 United States Court of Appeals, Seventh Circuit.
 Argued April 21, 1995.
Decided Sept. 20, 1995.
 
 Before BAUER, CUDAHY and MANION, Circuit Judges.
 
 ORDER
 
 1
 Jose Loreto Gamboa-Garibay ("Gamboa") appeals from the dismissal by the Board of Immigration Appeals ("BIA") of his appeal from a decision by the Immigration Judge ("IJ") finding that he was not entitled to a waiver of the joint petition requirement of Section 216(c)(4) of the Immigration and Nationality Act ("INA" or "Act"), 8 U.S.C. Sec. 1186a(c)(4), or suspension of deportation under Section 244(a)(1) of the Act, 8 U.S.C. Sec. 1254(a)(1).[1] We affirm.
 
 I.
 
 2
 Gamboa is a 52-year-old native and citizen of Mexico who illegally entered the United States in March of 1977. On January 25, 1986, he married Julia Ibarra, a United States citizen. After his wife successfully petitioned for his admission as the spouse of a United States citizen, Gamboa traveled to Toronto, Canada to obtain a visa, reentering the United States on March 4, 1987 as a conditional permanent resident pursuant to 8 U.S.C. Sec. 1186a(a).
 
 
 3
 Under the provisions of the INA, Gamboa and his wife were required jointly to petition to remove the conditional basis of his permanent residence sometime within the 90-day period immediately preceding the second anniversary of obtaining lawful resident status. 8 U.S.C. Secs. 1186a(c)(1)(A) & 1186a(d)(2). However, they failed to do so and on March 4, 1989 the Immigration and Naturalization Service ("INS") automatically terminated Gamboa's conditional permanent resident status. On August 9, 1989, the INS issued an order to show cause against Gamboa, stating that his conditional permanent resident status had been revoked and that he was therefore deportable under the Act.
 
 
 4
 On November 16, 1989, Gamboa divorced his wife and on November 27, 1989 filed an application for a waiver of the joint petition requirement. In response, the INS interviewed Gamboa regarding his marriage and concluded that he was unable to establish that his marriage was entered into in good faith. On this basis, the INS determined that Gamboa did not qualify for a waiver of the joint petition requirement and so commenced deportation proceedings.
 
 
 5
 At the initial deportation hearing held on May 2, 1990, Gamboa, represented by counsel, conceded that he was legally deportable but sought permission under 8 C.F.R. Sec. 216.5(f) to renew his request for a waiver of the joint petition requirement. In the alternative, Gamboa requested suspension of his deportation under 8 U.S.C. Sec. 1254(a)(1), which permits the Attorney General to suspend deportation and grant permanent residency status to an alien who has been in the United States continuously for seven years, is of good moral character, and whose deportation would result in extreme hardship. In the event these requests were rejected, Gamboa also requested permission to depart the United States voluntarily.
 
 
 6
 Leave was granted for Gamboa to renew his waiver request and to submit applications for any other available relief. At the final deportation hearing on September 17, 1990, Gamboa submitted applications for a waiver of the joint petition requirement and for suspension of deportation together with supporting evidence. Gamboa, his brother and two other witnesses appeared and testified that he had married his former spouse in good faith. Gamboa also testified as to the hardship he would suffer should he be forced to return to Mexico. However, the IJ rejected both grounds for relief. The IJ found that the hardships associated with returning to Mexico were essentially economic in nature and thus did not, standing alone, amount to the extreme hardship necessary to merit suspension of deportation. The IJ also found that Gamboa's testimony about his marriage was not credible and lacked real corroboration, and so determined that Gamboa had failed to establish that his marriage was entered into in good faith. On these bases, the IJ concluded that Gamboa was ineligible for a waiver of the joint petition requirement under 8 U.S.C. Sec. 1186a(c)(4) and that he did not merit a suspension of deportation under 8 U.S.C. Sec. 1254(a)(1).
 
 
 7
 Gamboa appealed this decision to the Board of Immigration Appeals ("BIA" or "Board"). The Board dismissed the appeal, though it granted Gamboa's request to depart voluntarily within 30 days. The Board agreed with the IJ's finding that the testimony and documentary evidence Gamboa had presented did not prove that he had entered into his marriage in good faith. Thus it concluded he was statutorily ineligible to seek a waiver under 8 U.S.C. Sec. 1186a(c)(4)(B). The Board also found ample support in the record to uphold the IJ's ruling that Gamboa did not qualify for suspension of deportation based on extreme hardship under 8 U.S.C. Sec. 1254(a)(1). Gamboa now seeks review of the Board's decision in this court.
 
 II.
 A. Standard of Review
 
 8
 Gamboa's challenge to the Board's decision encounters a formidable hurdle in the established standard of review. Relief under either of the sections at issue here is statutorily committed to the discretion of the Attorney General (see 8 U.S.C. Secs. 1186a(c)(4) and 1254(a)), and thus a denial thereof is reviewed only for an abuse of discretion. Garcia-Lopez v. INS, 923 F.2d 72, 74 (7th Cir.1991); Hernandez-Patino v. INS, 831 F.2d 750, 752 (7th Cir.1987). "The rule in this circuit is that a denial by the BIA[2] will be upheld unless: 1) it was made without a rational explanation; 2) it inexplicably departed from established polices; or 3) it rested on an impermissible basis such as invidious discrimination against a particular race or group." Garcia-Lopez, 923 F.2d at 74; see also Cordoba-Chaves v. INS, 946 F.2d 1244, 1246 (7th Cir.1991) (same). In exercising its discretion, the BIA is required to weigh all of the relevant factors and "state its reasons for denying relief." Id. However, this court "does not have the authority to determine the weight to afford each factor." Id. Consequently, unless the Board has clearly acted irrationally or otherwise arbitrarily, we must uphold its decision and deny Gamboa's appeal. Thus we cannot indulge Gamboa's request to reweigh the evidence. Of course, our review of the "BIA's legal conclusions and interpretations of the INA ... is de novo." Kaczmarczyk v. INS, 933 F.2d 588, 593 (7th Cir.1991).
 
 B. Waiver of the Joint Petition Requirement
 
 9
 Under the foregoing standard of review, we find nothing to indicate that the BIA in any way abused its discretion in denying Gamboa a waiver of the joint petition requirement. To obtain such a waiver, Gamboa was required, but ultimately unable, to demonstrate that his marriage to Julia was entered into in good faith but later terminated, and that he was not at fault in failing jointly to petition with her for removal of his conditional permanent residency status.
 
 
 10
 At the hearing on September 17, 1990, the IJ heard testimony from Gamboa indicating that he had met and begun dating Julia in May, 1985, and that the two later decided to get married in January, 1986. Gamboa also testified that his mother was present at the ceremony; that he and Julia lived together in Chicago (for a time with his mother as well); that Julia helped defray the expenses of the home through income earned performing baby-sitting chores; that he purchased furniture for their home; that they slept together in their home; and that he could not explain why she had left him.
 
 
 11
 To support this testimony, Gamboa submitted affidavits from relatives and friends indicating that they had been to the couple's place and observed them living together as husband and wife. He also presented photographs of himself and Julia, though none from their wedding. Ernesto Guzman, a man claiming to be Gamboa's neighbor, testified that he and his wife visited Gamboa and Julia often at their house during 1986 to 1989 and did not observe anything unusual about their marriage. He also corroborated several visits by Gamboa's mother to the couple's home. Mr. Guzman's wife, Rita Guzman, testified that she did not believe Gamboa had married just to get his green card. Finally, Gamboa's brother testified that Gamboa and Julia lived together and that she cooked for him and that they shared the same bedroom. It was also the brother's opinion that Gamboa did not marry merely to obtain legal residency in the United States.
 
 
 12
 On the other hand, the hearing revealed that Gamboa had not met any of Julia's relatives despite her having a brother who lived in Chicago. And notwithstanding the obvious tax advantages of filing as a married person or listing his putative wife as a dependent, Gamboa consistently filed his tax returns as a single person during the alleged marriage, though he did manage to list as a dependent his mother who lives in Mexico. Although Gamboa testified to having a normal marriage, he made no effort to look for Julia after she left, claiming ignorance of her whereabouts; yet his brother testified that he had learned from friends that she was in Los Angeles. Another odd inconsistency surfaced when the witnesses who testified to having visited the couple often were unable to describe any distinguishing characteristics of Gamboa's ex-wife or recall in any detail what they had done during the alleged visits. In addition, Gamboa failed to provide any historical documentary evidence, such as utility bills, insurance policies or correspondence in Julia's name, to support his claim of shared residence. Further, the supporting affidavits lacked sufficient detail to be meaningful, offering only conclusory statements in support of Gamboa. Finally, and ultimately of great significance to the Board, after observing the proceedings firsthand the IJ found that the witnesses who testified on Gamboa's behalf lacked credibility.
 
 
 13
 Exactly how such evidence should be weighed and precisely which conclusions and inferences should be drawn are not, as noted above, matters for this court to decide. Cordoba-Chaves, 946 F.2d at 1246. It is enough for us to confirm that the BIA reviewed the foregoing testimonial and documentary evidence and that the proffered explanation for its decision is rational and does not conflict with established policies or rest on otherwise impermissible grounds. Id. This we do without hestitation.
 
 
 14
 The Board's decision clearly indicates that it carefully and in detail considered the relevant evidence contained in the record, reviewing it for consistency and plausibility, and did not just summarily uphold the IJ's factual conclusions.[3] Of significance to the Board, for example, was the lack of any noteworthy documentary evidence corroborating that Gamboa indeed lived with Julia. We find nothing irrational in the Board's conclusion that this and other inconsistencies in Gamboa's rendition of the events justified the IJ's denial of the waiver petition. Nor does it appear that the Board's decision contravened any established policies. The Board was well within settled practice, for instance, to accord great weight to the IJ's opinion that the testimony in support of Gamboa was not credible.[4] See Lattig v. Pilliod, 289 F.2d 478, 480 (7th Cir.1961) ("The issue of credibility is solely the function of the hearing officer and not reviewable by the court."); Chun v. INS, 40 F.3d 76, 78 (5th Cir.1994) ("We cannot substitute our judgment for that of the BIA or IJ with respect to the credibility of the witnesses or ultimate factual findings based on credibility determinations."). Finally, there has been no suggestion that invidious discrimination or some other such irregularity influenced the Board's decision.
 
 
 15
 Therefore, regardless of how this court might have weighed the evidence were it in the position to do so, we conclude that the BIA did not abuse its discretion in denying Gamboa a hardship waiver under 8 U.S.C. Sec. 1186a(c)(4)(B).
 
 C. Suspension of Deportation
 
 16
 As a separate basis, Gamboa has also sought relief from deportation under 8 U.S.C. Sec. 1254(a)(1), which grants the Attorney General discretion to suspend deportation and adjust an alien's status where the alien has been physically and continuously present in the United States for at least the past seven years, can prove that during such time he was and is of good moral character, and where deportation would result in extreme hardship. The IJ determined that Gamboa was of good moral character and that he met the seven-year rule, but found that the economic difficulties he would encounter if deported to Mexico did not rise to the level of "extreme hardship."
 
 
 17
 The BIA affirmed the IJ's hardship conclusion. In doing so the Board found that while Gamboa may not be able to sustain in Mexico the standard of living that he has enjoyed in the United States, economic hardship alone does not establish "extreme hardship" for purposes of section 1254(a)(1). The Board also noted that Gamboa had presented no evidence that he would be unable to obtain gainful employment in Mexico. It further rejected the contention that Mexico's social, environmental, and health problems are sufficiently unique factors to demonstrate "extreme hardship" under the Act. Gamboa adds nothing new to the hardship issue in his briefs on appeal to this court, though his plaintive claims of future economic adversity have not gone unnoticed.
 
 
 18
 The Supreme Court has held that the BIA has the authority to construe "extreme hardship" narrowly. INS v. Wang, 450 U.S. 139, 145 (1981). "The application of the 'extreme hardship' requirement is committed to the BIA and will not be overturned simply because we might prefer another interpretation of the statute." Alvarez-Madrigal v. INS, 808 F.2d 705, 707 (9th Cir.1987); see also Palmer v. INS, 4 F.3d 482, 487 (7th Cir.1993) (quoting Alvarez-Madrigal ). In general, "[e]xtreme hardship will not be found absent a showing of significant actual or potential injury." Hassan v. INS, 927 F.2d 465, 468 (9th Cir.1991). This means "at least hardship substantially different from and more severe than that suffered by the ordinary alien who is deported." Sanchez v. United States INS, 755 F.2d 1158, 1161 (5th Cir.1985). Consequently, "[w]hen the potential hardships the alien may encounter are the same faced by any alien to be deported, the 'extreme hardship' standard has not been met." Cortes-Castillo v. INS, 997 F.2d 1199, 1204 (7th Cir.1993). See also Diaz-Salazar v. INS, 700 F.2d 1156, 1160 (7th Cir.), cert. denied, 462 U.S. 1132 (1983). Although economic factors should be considered in any analysis of extreme hardship, Marquez-Medina v. INS, 765 F.2d 673, 676 (7th Cir.1985), economic disadvantage alone does not constitute extreme hardship. Hernandez-Patino v. INS, 831 F.2d at 755; Mendoza-Hernandez v. INS, 664 F.2d 635, 638 (7th Cir.1981).
 
 
 19
 Under the standard for extreme hardship established by our cases and the cases of other circuits, it is clear that the BIA did not abuse its discretion in finding that Gamboa had failed to establish that his deportation to Mexico would result in extreme hardship. Gamboa has shown only that repatriation to Mexico will dramatically reduce his standard of living, but our cases indicate that is not enough to justify a finding of extreme hardship; Gamboa must demonstrate more than that he will be subject to the economic travails common to the people of Mexico. He has not done so, neither here nor in any of the proceedings below.[5]
 
 III.
 
 20
 For the foregoing reasons we find no abuse of discretion in the underlying proceeding. The decision of the Board of Immigration Appeals is
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 Further citations to the INA will reference solely the appropriate U.S.C. title and section
 
 
 [2]
 "The Attorney General, as authorized by Congress, 8 U.S.C. Sec. 1103, has delegated the authority and discretion to suspend deportation to ... immigration judges whose decisions are subject to review by the BIA. 8 CFR Secs. 242.8, 242.21 (1985)." Id
 
 
 [3]
 As an indication of its incisive review, the Board discovered from the record that Gamboa had left the United States and thus was arguably ineligible for a suspension of deportation under 8 U.S.C. Sec. 1254(a)(1), a point the IJ had missed. We touch on this in footnote 5 below
 
 
 [4]
 Contrary to respondent's brief, Gamboa has indeed challenged the IJ's credibility findings on appeal. He argues that since he was found to be of good moral character for purposes of his request for voluntary departure, it was error for the IJ to find that his testimony concerning his marriage was not credible. Admittedly, there is a certain logical appeal to Gamboa's position: how can a judge find someone to be of good moral character one moment and then in the next find that his testimony concerning another matter is not credible, i.e., that he is lying? Aren't the two conclusions mutually exclusive? Probably, at least in the abstract, but we nevertheless decline to hold that a finding of good moral character for purposes of granting a request for voluntary departure requires immigration officials to hold credible all other statements an alien may make
 
 
 [5]
 As a separate and independently sufficient ground for denying Gamboa's request, the BIA found (contrary to the IJ) that Gamboa had not been continuously present in the United States for the seven years preceding his application for suspension of deportation. The Board noted, and Gamboa here confirms, that he left the country in March of 1987 to obtain a visa, thus breaking the physical continuity of his residence. The Board then considered whether this departure was merely "brief, casual, and innocent and did not meaningfully interrupt [Gamboa's] continuous physical presence" in the United States, in which case (pursuant to 8 U.S.C. Sec. 1254(b)(2)) it would not preclude relief from deportation under section 1254(a)(1). The Board concluded that given its importance, Gamboa's trip to alter his immigration status was not "casual" within the meaning of the statute and thus disqualified him for relief from deportation
 We need not decide whether the Board was correct in its interpretation of the word "casual." This court has previously noted that "whether a trip must be 'wholly innocent' to qualify as 'innocent, casual, and brief' is an open question to which neither Congress nor the courts have provided a definitive answer," and thus "an issue on which deference to the BIA is particularly appropriate." Leal-Rodrigues v. INS, 990 F.2d 939, 944 (7th Cir.1993). Yet the Ninth Circuit recently rejected the very interpretation the BIA advances here and held that when an illegal alien leaves the United States on a single occasion solely to regularize his status in this country, his absence is "casual" within the meaning of section 1254(b)(2). Castrejon-Garcia v. INS, 1995 WL 424901, * 3 (9th Cir.). Because we have held, and it is enough, that Gamboa's plight does not rise to the level of "extreme hardship" under the statute, we reserve the issue of the correctness of the BIA's narrow definition of the word "casual" for another day.